**GLS DEVELOPMENT, INC., Plaintiff,**

v.

**WAL–MART STORES, INC. and Dimucci Development Corporation, Defendants.**

**No. 94 C 6323.**

United States District Court, N.D. Illinois, Eastern Division.

May 29, 1998.

Robert T. Palmer, Garfield & Merel, Ltd., Chicago, IL, for Plaintiff.

Peter D. Sullivan, Hinshaw & Culbertson, Gerard C. Smetana, Smetana & Avakian, Chicago, IL, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, Senior District Judge.

This Court has previously issued two substantive opinions in this action: the May 31, 1996 unpublished memorandum opinion and order ("Opinion I," 1996 WL 296594 [1]) that denied the Fed.R.Civ.P. ("Rule") 56 motion for summary judgment that had been advanced by defendant DiMucci Development Corp. ("DiMucci") against plaintiff GLS Development, Inc. ("GLS"), and the November 7, 1996 published opinion ("Opinion II," 944 F.Supp. 1384 [2]) that granted in part and denied in part the Rule 56 motion that had been brought by defendant Wal–Mart Stores, Inc. ("Wal–Mart") against GLS. What then remained for disposition and formed the subject of a five-day bench trial in November 1997 are four claims: GLS' breach of contract claim for damages against Wal–Mart, GLS' breach of contract claim for damages

against DiMucci, Wal–Mart's third-party claim against DiMucci and DiMucci's counterclaim against GLS. After much too long a post-trial period of delay, earlier this month the parties finally completed their respective submissions, comprising their earlier-filed proposed findings of fact and conclusions of law and their recent responses to the initial submissions by their adversaries.[3]

What follows are this Court's findings of fact ("Findings") and conclusions of law ("Conclusions") issued in accordance with Rule 52(a). To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both of those respects, see *Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

### Findings of Fact

1. This action stems from the checkered history of one aspect of the ultimately successful development of a parcel of commercial real estate located at Cicero Avenue and 26th Street in Cicero, Illinois (the "Property"). In 1992 William Pacella ("Pacella") was one of the partners in a partnership that held the beneficial interest in the land trust that owned the Property. At that time the Property was improved with a building (originally a store for the Wholesale Club) that was then under lease to Wal–Mart (a Delaware corporation with its principal place of business in Arkansas) for its operation of a Sam's Club store (Tr. 277).

2. Accordingly to Richard Filler ("Filler"), the former Director of Leasing for DiMucci (an Illinois corporation with its principal place of business in Illinois), DiMucci had originally become involved with the development of properties in that area after it

---

1. Citations to Opinion I will take the form "Opinion I at *—," referring to the Westlaw pagination.

2. Citations to Opinion II will take the form "Opinion II at—," referring to the F.Supp. pagination.

3. Any citations to the parties' post-trial submissions will simply take a form that begins with the name of the submitting party, continues with "I" or "II" (depending on whether the reference is to the party's initial submission or to its response to the other parties' submissions) and concludes with a page citation.

had been approached by the Town of Cicero ("Cicero") to render advice as to the Property's development potential (Tr. 27). Although Filler said that the parcel was smaller than DiMucci was accustomed to handling, after reviewing the availability of the surrounding parcels DiMucci agreed to do the development and sought a redevelopment agreement with Cicero (Tr. 28).

3. DiMucci retained as its real estate broker Eagle Real Estate ("Eagle") (Tr. 236), a firm with which Filler had previously worked on other deals (Tr. 29). Filler knew that Eagle had a good relationship with Wal–Mart (*id.*). Within a week or two after looking at the project, Filler asked Eagle's Michael Blonstein ("Blonstein") to see if Wal–Mart would be interested in relocating its Sam's Club to a parcel south of 29th Street (Tr. 29–31).

4. Blonstein then reported back to Filler that Wal–Mart would not be interested in moving. Blonstein told Filler that Wal–Mart was instead interested in building a new Sam's Club and Wal–Mart store on the Property, where the existing Sam's Club was located (Tr. 31). Further, in keeping with its normal practice, Wal–Mart planned to acquire and then self-develop the Property (Tr. 237, 479). Eagle had no written or oral brokerage agreement with Wal–Mart: Instead Wal–Mart told Eagle to reach an agreement with the seller to pay Eagle's commission (Tr. 234–35).

5. Wal–Mart directed Eagle President George Erwood ("Erwood") to talk with Pacella and get the Property under contract. Originally Erwood dealt with Pat Peery ("Peery") and John Ferrick at Wal–Mart, but all of his later dealings—and the relevant dealings of everyone else involved in the transaction at issue—were with Peery's successor Kim Black ("Black," the name that will be used throughout these Findings, though she is now Kim Lane as a result of her marriage)(Tr. 234–35).

6. On November 5, 1992 Wal–Mart signed an Option To Purchase and Purchase Agreement ("Option Agreement," P.Ex. 8), under which Wal–Mart had three successive 90–day options to purchase the Property for $12 million. To keep the options in effect, Wal–Mart paid $250,000 into escrow, to be withdrawn by Pacella in stated increments at the beginning of each option period (Tr. 174).

7. It was originally contemplated that Wal–Mart would buy the four parcels adjoining the Property from DiMucci, which had an option on them, then build a new Sam's Club on the adjacent property, demolish the existing building on the Property and replace it with a new Wal–Mart store, then sell off the excess land to Menard's (Tr. 238, P.Ex. 16). In late 1992 representatives of DiMucci started negotiations with Cicero regarding the redevelopment of DiMucci's parcels and the Property (Tr. 31, 277).

8. As a result of the negotiations to that point, early in 1993[4] Wal–Mart and Cicero arrived at terms for a redevelopment agreement for a Wal–Mart and Sam's Club, and such a document was prepared for execution by Wal–Mart and Cicero (P.Ex. 12). On January 29 Cicero's attorney Dennis Both ("Both") sent a letter to Wal–Mart to welcome it to Cicero (Tr. 279, P.Ex. 24). And on February 2, with the first 90–day option period expiring, Wal–Mart extended its option on the Property for another 90 days (Tr. 175–76, P.Ex. 15).

9. Somewhat later (around March) Black assumed responsibility for the project within Wal–Mart. At that time she was a real estate manager for the geographic area that included Illinois (Tr. 592). On March 29 the Wal–Mart Real Estate Committee met and decided not to build a Wal–Mart store on the Property site. Instead Wal–Mart directed Eagle to find a developer to build a new Sam's Club on the site and to lease it back to Wal–Mart (P.Ex. 19, Tr. 237).

10. Because DiMucci was already working in the area, Erwood communicated with DiMucci about becoming the developer of the Property (Tr. 238–39). In addition, in an effort to get a second store for the site, on March 31 Eagle sent information about the development to Home Depot, a company with

---

**4.** Because virtually all of the relevant events thereafter took place during 1993, all dates that are referred to in these Findings without a year designation are 1993 dates.

which Eagle had been working on store site selection (P.Ex. 20, Tr. 240).

11. During that same time frame or shortly thereafter (around April 26), Both had concluded that Wal–Mart did not intend to proceed with the redevelopment agreement that had been negotiated but not executed. Both immediately sent a letter to Blonstein, expressing his opinion that Wal–Mart had not dealt in good faith and telling Blonstein to advise Wal–Mart not to "shop" the agreement. Instead he said that any persons interested in the site would need to negotiate directly with Cicero (P.Ex. 21).

12. Both sent that letter because Cicero had negotiated the agreement on the basis of Wal–Mart's strength, and Both did not want anyone to think that another retailer could just step into Wal–Mart's shoes (Tr. 280–82). Wal–Mart is one of the largest retailers in the United States, with hundreds of stores nationwide and annual revenues of several billion dollars (Tr. 590–91).

13. When Both was then advised that DiMucci would be the developer of the Property, he proceeded to negotiate a new redevelopment agreement for the Property with DiMucci (Tr. 284–85). And on May 4, with the second 90–day option period expiring, Wal–Mart extended its option for the final 90–day period to expire on August 2 (Tr. 176, P.Ex. 24).

14. On May 27 Filler wrote a letter to Blonstein setting forth DiMucci's proposal to Wal–Mart for a build-to-suit Sam's Club store on the Property. Filler proposed a 25–year lease, with rentals starting at $6.95 per square foot and increasing every five years until they reached $8.95 in the 21st to 25th years (Tr. 34–35, P.Ex. 27). Within a week after submitting that proposal, Filler spoke with Blonstein about it. Blonstein told Filler that Wal–Mart felt the rents were too high (Tr. 38).

15. Indeed, on June 15 Black sent a fax to Erwood. Attached to the cover page was a copy of the DiMucci proposal, on which Black had written a note to Erwood that Wal–Mart needed to get the rent into the $6.00-$6.50 range, with no increases (P.Ex. 27). On the cover page Black had written, "Discuss deal and rent with Pat [Peery]. May not want to pursue deal due to Pace acquisition in Bedford Park" (P.Ex. 28). Black said that reference was to Wal–Mart's recent acquisition of a company called Pace, which had a store in nearby Bedford Park (Tr. 596).

16. In that same month, after three months of dealing with DiMucci, Black had concluded that negotiations were at an impasse. By that time she had become concerned about getting the deal done before the Option Agreement expired, which would cause Wal–Mart to lose the $250,000 that it had paid for the option (Tr. 594–96). Accordingly Erwood was told that Wal–Mart couldn't make an acceptable deal with DiMucci and was directed to find another developer (Tr. 239). Blonstein testified that he obtained Sal DiMucci's permission in that respect and that Sal agreed to sell DiMucci's position to another developer (Tr. 480, 484).

17. On June 23 Erwood telephoned Gary Schwab ("Schwab") of GLS (a Colorado corporation with its principal place of business in Colorado), another real estate developer known to Erwood (Tr. 317, P .Ex. 35). GLS had previously developed and leased several Wal–Mart stores (Tr. 316). Erwood asked Schwab whether GLS would be interested in development of the Property for a Sam's Club. Erwood gave Schwab information as to the project, including its location, size and acreage, and said that an existing 500,000 square foot building would also have to be demolished. Erwood further said that the ground cost was $12 million but that Cicero would be providing tax increment financing ("TIF") and had done a Redevelopment Agreement with Wal–Mart. Erwood explained that GLS would be working under a short time frame and told Schwab to call Black directly (Tr. 317–19).[5]

5. It should be noted at this point that DiMucci seeks to label Eagle as GLS' agent, in an effort to invoke evidentiary rules that would ascribe to GLS any statements made by Erwood or Blonstein (see, e.g., Fed.R.Evid.801(d)(2)(D)). That effort involves an element of irony, given the fact that DiMucci brought Eagle into the proposed transaction in the first place (see Finding 3). And it has already been said that as a broker Eagle had been directed to look to Pacella (as

18. Either that day or the next day, Schwab called and spoke to Black. They discussed what documents Wal–Mart had, including the Option Agreement and the Redevelopment Agreement with Cicero (Tr. 320–21). Schwab requested, and promptly received and reviewed, copies of the Option Agreement, the Redevelopment Agreement, the site plan and a pro forma set of numbers from an engineering firm giving a breakdown of costs and expenses intended to show the viability of the project (Tr. 319–20). Depicted on the site plan were a Sam's Club, a Wal–Mart and a Menard's, which in combination looked as though they would not fit on the existing acreage but would require additional land to the south. Schwab was told by Erwood or Black that before it changed its mind, Wal–Mart had planned to self-develop the Sam's Club and Wal–Mart, while it would sell the other ground to Menard's (Tr. 321).

19. During the initial discussions, no one told Schwab about DiMucci or about any situation involving another possible developer (Tr. 322). Further, Schwab was told that the Redevelopment Agreement was done (Tr. 324).

20. Schwab found the project attractive to GLS because the creditworthiness of Wal–Mart and Home Depot made it fairly risk-free, while the TIF money would allow Wal–Mart to get a favorable lease rate and GLS to get a higher-than-normal return. Schwab valued the project at $25 million, with a profit to GLS of between $4 and $5 million (Tr. 334–35). Because Schwab had been told that the Redevelopment Agreement was already done, he also believed that it would be a simple matter to get it changed over from Wal–Mart's name to that of GLS (Tr. 324). Nevertheless Schwab knew that the project would have to be fast-tracked, with Wal–Mart needing to exercise its option on August 2 and with GLS then needing to close with Pacella within 30 days (by September 2)(*id.*). Because GLS did not have enough people to handle this new expedited project

as well as the projects on which GLS had previously been working, GLS had to drop its interest in those other projects, which Schwab valued at $10 million (Tr. 329–33).

21. Schwab knew that the single most important thing for GLS to do was to get its numbers in line, put together a final pro forma and send it to Black so that she could take it to Wal–Mart's Executive Committee (Tr. 322–24). To do the pro forma, Schwab had to pull together all the numbers that Wal–Mart had generated and evaluate them, rework them and figure out from his knowledge and background whether he trusted the numbers (Tr. 322–23). In contrast to the "hard numbers" supplied by the engineer, Schwab said that the "soft numbers" were something that only he as developer could put in. Those included such things as the amount of the loan, the interest rates and the architect's cost (Tr. 323).

22. Schwab first became aware of DiMucci when he noticed a figure for DiMucci in the "soft costs" that GLS was being given by Erwood (Tr. 323). When Schwab asked Erwood what the DiMucci figure was for, Erwood told him that DiMucci had done some previous work on the project and that the anticipated payment represented compensation for DiMucci's time and effort. Erwood also told Schwab that because DiMucci had done other work for Cicero and knew Cicero officials, the money was to keep DiMucci happy and prevent any trouble (Tr. 326–27).

23. During the course of GLS' efforts as the proposed developer, the amount of the DiMucci payment figure kept changing, at one time being $200,000, then being $400,000 (Tr. 326). Ultimately Blonstein told Schwab that GLS would have to pay DiMucci $500,-000 in order for GLS to do the deal (Tr. 481), and the proposals then prepared by Schwab and GLS reflected that (Tr. 481).

24. By July 21 GLS had sent Wal–Mart a letter proposing the basic terms of a deal. GLS offered to acquire Wal–Mart's rights to

---

seller of the Property) rather than to anyone on the buyer's side (the developer, whether DiMucci or GLS) or to Wal–Mart for its commission (see Finding 4). But those things do not control— what *does* govern the situation is that the evidence simply does not support DiMucci's posi-

tion. It is clear that Eagle did not speak for GLS in the respects urged by DiMucci. Hence GLS will not be tagged with any statements or admissions by the Eagle people that GLS did not itself adopt or ratify.

the Option Agreement, exercise the option by August 2 and close on the purchase by September 2 (Tr. 327, P.Ex. 34). By its terms the GLS offer was contingent upon the accomplishment of several conditions by the latter date: (a) a lease containing the stated terms had to be executed between GLS and Wal–Mart; (b) Home Depot had to execute a lease acceptable to GLS; (c) a TIF agreement had to be executed between Cicero and GLS, providing for the sale of bonds and distribution of the proceeds to GLS within 90 days of closing; and (d) GLS had to confirm that the site development cost estimates prepared by the engineer were sufficient to do the work (P.Ex. 34). According to Black the GLS proposal included a pro forma dated July 20 that listed as one of the costs of the Wal–Mart project alone a $250,000 payment by GLS to DiMucci for predevelopment consulting fees (Tr. 630–31, D.Ex.34–A).

25. On July 28 GLS sent a letter to Home Depot establishing the economics for doing a lease with Home Depot (Tr. 328, P.Ex. 38). That proposal included a pro forma that listed as one of the costs another $250,000 payment to DiMucci. Schwab said that no one from Home Depot had told him to do this (Tr. 373). Blonstein testified that he spoke to Home Depot's representative Mike Folio ("Folio") about the matter (Tr. 482).

26. To reflect GLS' total projected development (encompassing both the proposed Sam's Club store for Wal–Mart and the proposed Home Depot store), Schwab testified that GLS provided Wal–Mart with an overall pro forma that accordingly listed a $500,000 total payment from GLS to DiMucci (Tr. 329). Black denied that she had ever seen a copy of any such pro forma (Tr. 631), as to which Wal–Mart's counsel emphasizes that the only version in evidence carries a notation that it was "updated July 29, 1993" (P.Ex. 41). But Black's denial was not credible, being impeached by her prior sworn deposition testimony in which she expressly admitted having received a pro forma from GLS that provided for a $500,000 payment to DiMucci (Tr. 718). And consistently with that prior testimony and at odds with her denial at trial, Black also admitted that "sometime in August" Schwab had told her

that GLS was going to pay DiMucci $500,000 (Tr. 638). Moreover, no one from Wal–Mart ever told GLS that if Home Depot refused to accept the $250,000 line item in its pro forma, GLS would not have to pay the full $500,000 to DiMucci (Tr. 374).

27. On August 2 Black wrote Schwab to advise him that Wal–Mart's Executive Committee had accepted the GLS proposal (Tr. 596–97, P.Ex. 46). Black there represented that Wal–Mart would have its attorney exercise the option under the Option Agreement immediately and prepare an assignment to GLS. On the same date Wal–Mart's attorney gave written notice to Pacella that Wal–Mart was exercising the option (Tr. 176–77, P.Ex. 44). That exercise did not require any contemporaneous payment by Wal–Mart, but an escrow was required to be opened and the purchase price deposited by September 2. As matters were to develop, however, later discussions between the attorneys for Wal–Mart and Pacella resulted in a number of agreed postponements for the escrow opening date, so that the contract was not ultimately declared to be in default until November 16 (Tr. 177–79). And as a result of the post-August 2 developments referred to in later Findings, Wal–Mart never did provide GLS with the promised document assigning its rights under the Option Agreement to GLS (Tr. 404).

28. To return to DiMucci's situation during the period just discussed, Filler testified that he had been unaware that Wal–Mart was looking for another developer (Tr. 39). Consistently with that position, on July 30 Filler wrote Home Depot to request further documentation and the scheduling of a meeting to arrive at the final terms of an agreement (Tr. 39–40, P.Ex. 42). On August 2 Home Depot responded to Filler, rejecting DiMucci's proposal and advising him that Home Depot would be using a developer chosen by Wal–Mart (Tr. 40, P.Ex. 45). Shortly before he received that letter, Filler had been told by Blonstein that GLS was going to be the developer (Tr. 40–41).

29. Cicero also had not previously been told of any decision not to use DiMucci as the developer of the Property. On July 14, without mentioning the negotiations with GLS,

Blonstein assured Both that Wal–Mart and Home Depot were prepared to go forward with the development of the Property and to exercise the purchase option and close by September 2 (Tr. 282, P.Ex. 33). On July 19 Both wrote to Blonstein to confirm those statements and to request that Blonstein forward to him written confirmation of the facts from representatives of Sam's Club and Home Depot (P.Ex. 33).

30. When Erwood was told that Wal–Mart had approved the GLS proposal, he called Both to advise him that GLS would be the developer of the Property (Tr. 244–45). Both testified that Erwood's announcement came at him "from left field." Both had never heard of GLS and knew nothing about it, for Cicero had been dealing only with DiMucci, which Both understood was going to be the developer (Tr. 290–91).

31. Both told Erwood that Cicero had done its own diligence and had negotiated, and thought that it had reached an agreement, with DiMucci. Although Cicero was not going to close the door on another developer, Both said that it was unhappy about the way things were developing or not developing, that its officials did not want Wal–Mart dictating how to run the Town, that it was Cicero's money that was paying for the development, which involved a large investment, and that Cicero did not want to be taken for granted (Tr. 291–92).

32. On August 3 Erwood met with Both and other Cicero representatives, including the President and some Councilmen, and made a pitch for GLS. They told Erwood that they would consider it and get back to him (Tr. 249, P.Ex. 47). On August 5 Both wrote Blonstein a letter, excoriating him both for ignoring the admonition in his April 29 letter not to shop the deal and for taking Cicero for granted as a rubber stamp. Both said that Cicero would evaluate the finances of the development and the developer and make a determination as to whether Cicero desired to move forward. Both closed by requesting a meeting with the principals of the tenants (Tr. 291, P.Ex. 48).

33. Both testified that he called Black and asked her for an explanation. Both said that he didn't "slam the door" on her, but

expressed Cicero's concerns that they had put a great deal of time and effort into an agreement and had looked at and been satisfied with the qualifications of DiMucci. He said to her, "Now to start all over again. Why? Why didn't you bring that up earlier?" (Tr. 293).

34. On August 13 Schwab wrote Cicero President Betty Loren–Maltese, advising her of GLS' involvement in the project and requesting a meeting as soon as possible (P.Ex. 53). Schwab's letter was followed by an August 16 letter to Both from Home Depot, advising him that Home Depot had reached terms with GLS and requesting a meeting to discuss the project with Cicero (Tr. 483, P.Ex. 54).

35. For its part, after DiMucci learned of GLS' involvement in the Wal–Mart project it took active steps to get back into the deal instead of GLS. Filler had telephone discussions with Black about why Wal–Mart should not use GLS. Filler told her that an outsider from Colorado would have a difficult time recreating what DiMucci had already created in its work with Cicero and in its presentation to Cicero (Tr. 53). Filler testified that he had told Black that he was going to meet with Schwab to try to dissuade GLS from doing the deal, and she said that would be fine. Filler understood that if he were successful Wal–Mart would approve GLS leaving the deal (Tr. 53–54).

36. Filler had previously been told by Blonstein that GLS was prepared to pay DiMucci $500,000 (Tr. 50). And Blonstein testified that Filler had told him of Filler's intention to go to Colorado to offer Schwab $500,000 for GLS to step aside. Blonstein said that when he told Black about that, she responded that Wal–Mart did not care as long as it got its store at that location on time and built to its specifications (Tr. 484–85). Although Black denied that she knew beforehand about Filler's meeting with Schwab or its details (Tr. 692), her denial was not credible and is not credited by this Court.

37. On August 19 Filler met with Schwab in Colorado Springs for about five hours (Tr. 337). Schwab testified that Filler told him

how much work DiMucci had previously done on the project. That was a greater involvement and for a greater period than Schwab had been led to believe. Filler also described the difficulties that Cicero politics were likely to cause GLS. Filler asked Schwab how much money it would take for GLS to step aside (Tr. 337–38).

38. According to Schwab (whose version this Court credits), Filler started at $250,000, then ultimately offered GLS $500,000 to withdraw (Tr. 339). Schwab responded that he was not interested. He told Filler that the deal was extremely attractive to GLS and that GLS did not want to sell out Wal–Mart. Schwab said that his credibility with Wal–Mart was the issue and that he needed to honor his commitment to Wal–Mart (Tr. 338–39, 442).

39. Schwab was not made aware that Wal–Mart knew of and had approved Filler's offer to replace GLS. Schwab testified that would have been a material piece of information to him in making any decision whether to accept an offer to be bought out (Tr. 339–40).

40. By late August Black had concluded that Cicero would proceed with the deal only if Wal–Mart used DiMucci as the developer (Tr. 720). Black testified that she did not want to fail to fulfill a deal that had been approved by the Executive Committee (Tr. 594–95).

41. On August 23 Schwab sent a fax to Black, enclosing his letter to Cicero and information on Home Depot. On the cover page he wrote, "We had agreed to pay DiMucci $500,000 on both your site and Home Depot's site which was more than fair. It was in our proforma # s [numbers] we sent you" (Tr. 369, P.Ex. 57).

42. On the same day Black spoke with Filler. And on the following day Filler submitted a new proposal for DiMucci to develop the Property on terms discussed during the August 23 conversation (Tr. 608–09, P.Ex. 58). DiMucci's newly proposed lease terms were the same as those contained in the GLS proposal, which were significantly more favorable to Wal–Mart than had been set out in DiMucci's proposal of May 27. In addition

DiMucci offered to pay GLS $250,000 upon funding as "good will" (P.Exs. 58, 34).

43. Schwab testified that Black telephoned him on August 24 and asked GLS to relinquish its rights to the project, due to the difficulties with Cicero, so that Wal–Mart could get its store. Black said that they had a lot of work that had to be done and needed to move forward (Tr. 344–46). At that time GLS did not have signed leases with Wal–Mart or Home Depot, nor did it have a signed Redevelopment Agreement with Cicero (Tr. 413). Although Black denied ever asking GLS to step aside from the deal (Tr. 600), her denial was not credible, being impeached both by her prior sworn deposition testimony that she simply "did not recall" any such conversations and by her signing the August 27 letter from GLS (see Findings 47 and 48) without changing the language "in consideration for stepping aside" (Tr. 600, P.Ex. 59).

44. Schwab testified, and this Court credits, that Black promised that she would "make sure" that GLS "was taken care of" and that it would "get the same deal" as it had been prepared to pay DiMucci. As Black knew, that was a total of $500,000 split as a cost between the Wal–Mart and Home Depot leases. Black told Schwab that the payment would be made at closing, which Schwab reasonably took to mean when the sale closed on the Property (Tr. 346, 356). There was no mention as to who would be paying GLS the $500,000 (Tr. 387)—it represented a direct and unequivocal promise and undertaking by Wal–Mart that GLS would receive that amount.

45. Black further told Schwab that Wal–Mart would give GLS "a few" deals in the future, though she did not limit the locations of those future deals (Tr. 356). Schwab viewed the undertaking as to future deals to be far more valuable than the $500,000 payment, for he estimated that they could be worth another $5 million (Tr. 359–60). By the end of the conversation, Schwab had agreed on behalf of GLS to drop out of the deal (Tr. 347). During the conversation Schwab asked Black to put her promise about the $500,000 in writing, which she told him she would do (Tr. 390).

46. Just a few days later (on August 27) Schwab again spoke with Black and reminded her that he had not received a letter from her confirming their August 24 conversation. Black said that she had been busy, but that she would ultimately get around to it (Tr. 382). During the course of that conversation Black told Schwab that Wal–Mart would give GLS "a couple" of deals. To Schwab that was a reduction in her prior promise of "a few" deals, which to him meant at least three transactions. Black further limited the geographic scope to the Chicago Metro area, a limitation that had not been part of their original agreement (Tr. 356).

47. Concerned about what he viewed as a reduction in the number of the very valuable deals, Schwab immediately faxed Black a letter confirming that Wal–Mart would provide GLS with the development of two future site locations in Chicago proper or its suburbs (Tr. 359, P.Ex. 60). Though Schwab's fax made no reference to Black's original promise as to the $500,000 payment to GLS, Schwab testified credibly that this was just because Black had said nothing to dispute her earlier unequivocal promise, and because she had further said that she would be sending him a confirming letter (Tr. 360, 394).

48. Before she signed and returned Schwab's letter to GLS on August 27, Black crossed out the language about providing two future site locations for GLS to develop and substituted language that Wal–Mart would "use its best efforts to find another location" and added "should W–M continue the Chicago Metro Program" (P.Ex. 60). To be sure, Black's backing away from the terms of her

earlier promise referred to in Finding 45, both by the limitations that she later imposed in their next conversation (Finding 46) and then by the changes referred to in this Finding, makes no difference in the outcome here because of this Court's Opinion II ruling as to the unenforceability of that part of her promises. But her conduct in those respects plainly confirms that she is not a person whose word is her bond. As such, it bolsters this Court's rejection of her credibility in the several respects referred to in these Findings.

49. Former GLS employee Brenda Harden ("Harden") testified that she sat in on the August 27 conversation. Harden confirmed that Black and Schwab discussed GLS stepping aside as long as GLS received $500,000 and some future development projects (Harden Dep. 18–19). And Harden confirmed that Black then told Schwab that she would see to it that GLS was paid the $500,000 and that she would protect GLS' interests (id. 20). Later, before she left GLS in May 1994, Harden sat in on approximately ten further conversations between Schwab and Black, during which Black had affirmed her promise that she would make sure that GLS was paid $500,000 (id. 46–47).[6] Again those reaffirmations, like Black's original promise, constituted a direct and unequivocal promise and undertaking by Wal–Mart that GLS would receive the $500,000.

50. In the first part of September Schwab again approached Black about documenting her promise that Wal–Mart would protect GLS and assure that it was paid. Schwab testified that she acted irritated by

---

6. Wal–Mart's submissions attempt to nit-pick Harden's testimony by pointing to a nonmaterial difference in the precise language that she ascribed to Black from the language that Schwab described in his testimony. But that won't work. Quite apart from the fact that such insubstantial differences are to be expected in witnesses' testimony regarding the same conversations (indeed, it is grounds for suspicion when two accounts are so identical as to indicate a total rehearsal of precisely how the witnesses should testify—thus perhaps suggesting the witnesses' creation of a fictitious version, or at least testimony in which the wish is the father to the thought), Harden's statement that Black promised "that she would see to it that he [Schwab] was paid" is the wholly persuasive equivalent of Schwab's statement that

Black promised that "she would assure that I was paid whatever amount of money that I was paying to DiMucci, that she would make sure that I was taken care of, and I would get that same deal—get that same amount of money." It is highly disturbing to find Wal–Mart's counsel materially mischaracterizing Harden's testimony by completely ignoring her vital just-quoted statement to urge instead that "according to Harden, Black used the word 'protect', rather than the words 'make sure'" (Wal–Mart I at 10; accord, id. at 19). On the contrary, that language was only supplemental to Harden's key testimony, in which both she and Schwab have confirmed an unequivocal, direct, enforceable promise on the part of Black—and hence on the part of Wal–Mart.

his lack of trust in her word and reiterated that GLS would be taken care of (Tr. 382–83).

51. Although Black acknowledged that she had conversations with Schwab in late August about GLS getting paid (Tr. 649), she denied at trial that she had ever told Schwab that Wal–Mart would see to it that GLS was paid the same as GLS had been prepared to pay DiMucci (Tr. 650). Again Black's denial was not credible. It was not only contradicted by Schwab and Harden and by Black's failure ever to take issue with the letters from Schwab that reiterated her promise, but it was also impeached by her prior sworn deposition testimony that simply said "I don't recall making those [statements], no" (Tr. 725–27). It was further impeached by the rebuttal testimony of Richard Merel ("Merel"),[7] who had been a party to at least two telephone calls between Schwab and Black in early September, during which Black had in fact told Schwab that she would "make sure" that GLS was paid at the time of closing (Tr. 735).[8]

52. To turn briefly to DiMucci's version of events, Filler testified that in his discussions with Black before August 27 she had asked him to have DiMucci pay $500,000 to GLS, but that Filler had refused (Tr. 58–60). In that respect Filler said that he told Black that GLS should not be paid the $250,000 for the Home Depot lease because GLS had not put in time, effort and negotiations and wasn't producing the work (Tr. 61). Those statements by Filler were not only incorrect but were known to be so by Black. GLS had in fact reached agreement with Home Depot on the basic lease terms before August 16, and Black had seen a copy of Home Depot's August 16 letter to GLS (Tr. 599–600, P.Exs. 54, 57).

53. Black claimed that she had never asked DiMucci to agree to pay GLS $250,000, but said that the figure had rather been arrived at through direct negotiations between GLS and DiMucci (Tr. 725). Once more Black's testimony on this point was not

credible, being contradicted by both Filler and Schwab. Further, Black admitted that Filler had simply told her that he had offered $250,000, and that neither he nor Schwab ever told her that any agreement had been reached between them (Tr. 697, 723). Instead an October 26 letter from Filler to Black characterized DiMucci's agreement to pay GLS $250,000 as being done as an "accommodation" to Wal–Mart (P.Ex. 73):

> We agreed as an accommodation to you to pay GLS Development, Inc. ("GLS") Two Hundred Fifty Thousand Dollars ($250,000) in consideration of the time it spent dealing with you on the same transaction.

Though Wal–Mart refuses to recognize this, that "accommodation" reference is strongly corroborative of Schwab's characterization of Black's having made the critical promise that Wal–Mart would make sure that GLS got paid (and is correspondingly damaging to Black's denial in that respect). This evidentiary determination is not vitiated by the fact that the commitment that Black obtained from DiMucci as an "accommodation" covered only half of the promised $500,000, both because DiMucci would understandably have resisted the entire amount being tacked on to the economics of its deal on the Wal–Mart store alone and because Wal–Mart, as the party in control of the Property and hence of the development, could reasonably view itself as also being in a position to call for an equivalent "soft cost" to be made part of the Home Depot transaction.

54. On August 27—the same day that Black spoke with Schwab—Filler sent Wal–Mart a Letter of Intent ("Letter," P.Ex. 61) confirming the terms of the understanding that had been reached between DiMucci and Wal–Mart. Letter ¶ (f) provided:

> At such time as the tax increment financing bonds to be issued by the City of Cicero in connection with our acquisition of the property are funded, we agree to pay GLS Development, Inc. Two Hundred Fifty Thousand Dollars ($250,000) as a cancel-

7. See Appendix.

8. As the Appendix reflects, this Court would have credited Schwab's version and discredited

Black's version by a substantial preponderance of the evidence even without reference to that rebuttal testimony by Merel.

lation fee for its existing agreement with you.

Despite Filler's labeling of DiMucci's $250,000 commitment as simply being for the Wal–Mart deal, he said that in return for DiMucci's agreeing to pay GLS $250,000 he expected GLS to cease dealing with Home Depot as well as Wal–Mart (Tr. 147).

55. On August 28 Schwab wrote Black (P.Ex. 62) commenting on the Letter. Schwab reminded Black that GLS wanted and was entitled to the same amount as it would have had to pay DiMucci—$500,000—and said that he was looking for "Wal–Mart's support and protection" in getting that fair amount. Schwab enclosed a draft "Settlement Agreement" to be signed by GLS, Wal–Mart, Di Mucic and Pacella (but not by Home Depot) requiring DiMucci to pay $530,000 to GLS (the extra $30,000 being reimbursement for architects' and attorneys' fees). That proposed agreement was never signed (Tr. 748).

56. Black testified that she told Schwab that she was going to sign the Letter (Tr. 650, 724). Black further testified that she felt Wal–Mart had no obligation to assist GLS in the collection of the $250,000 payment, but that she offered her support (Tr. 621–22). Black said she believed that DiMucci owed GLS the money (Tr. 622). Once more Black's testimony as to what she purportedly said to Schwab was impeached by her prior sworn deposition testimony that she had no discussion with Schwab about protecting GLS, but simply signed the Letter (Tr. 727–28).

57. Because Schwab believed that the option agreement would expire on September 2, he continued to monitor the deal to make sure that the closing would take place and GLS would get paid (Tr. 455, 465). Thus on September 8, believing that DiMucci was going to have executed leases and Wal–Mart's assignment within two days, Schwab faxed Black asking her to first have DiMucci sign a draft letter that he enclosed, acknowledging its responsibility to pay GLS $500,000. Schwab reminded her of when she had asked GLS to step aside so long as it got the same deal as it was providing DiMucci (P .Ex. 65).

58. On the same day Schwab faxed a letter to Home Depot's representative Folio (P.Ex. 66), referring to conversations that he had with Wal–Mart on August 21 and 23 about stepping aside, provided that GLS got the same deal that it had been providing DiMucci—$250,000 for each lease. Schwab stated that he had the agreement between Wal–Mart and DiMucci to pay $250,000 for Wal–Mart, and asked Home Depot to enter into a similar letter undertaking. But Schwab testified (and this Court credits) that Black had never told him that if the full $500,000 was not paid by DiMucci or Home Depot, the amount would not be paid at all (Tr. 355)—instead the Wal–Mart promise to make sure that GLS was paid the $500,000 was Wal–Mart's direct responsibility, which it could discharge by arranging payment for GLS from one or both of DiMucci and Home Depot, but which *it* was obligated to pay in full in the absence of its having made such arrangements.

59. On September 14 Schwab again faxed proposed letters to Wal–Mart and Home Depot, requesting that they ask DiMucci to sign the letters (P.Exs. 68, 69). Nothing was done, however. Black admitted that she made no written response to the September 8 and 14 letters that GLS sent her (Tr. 612–13).

60. On September 20 Schwab faxed a letter to Home Depot, asking it to condition the deposit of its lease and the closing of the transaction on evidence that DiMucci had paid $250,000 to GLS, an agreement that Schwab said Wal–Mart had entered into (P.Ex. 71). On September 29 Home Depot responded that it had asked DiMucci to memorialize its agreement with GLS, but that Filler had said there was no such agreement (P.Ex. 72).

61. On October 19 Filler met with Schwab and sought to get GLS to sign a general release in exchange for the payment of $250,000 (Tr. 362). Also present at the meeting were DiMucci's attorney Jerry Biederman and GLS' attorney Merel (Tr. 361, 750–51). Schwab refused to sign, telling Filler that GLS' deal with Black was that GLS would get $500,000 (Tr. 362). Schwab also refused to sign because he thought a release

might have precluded GLS from getting the extra projects that Wal–Mart had promised it (Tr. 449).

62. On November 2 Filler faxed to Black "[a]s per our conversation" a proposed "Amendment to Letter of Intent" that would condition DiMucci's $250,000 payment to GLS upon GLS furnishing both Wal–Mart and DiMucci with a general release before closing (P.Ex. 73). That document, which this Court finds not only represented an impermissible alteration of DiMucci's firm agreement to pay the $250,000 but also did not reflect a revision acceptable to Wal–Mart, was never signed.

63. Before DiMucci would have been prepared to close, Filler said that it would have needed the Wal–Mart and Home Depot leases and the Redevelopment Agreement with Cicero to be in place (Tr. 71). Filler testified that anything that needed to be done with regard to redevelopment needed to be done before expiration of the option period (Tr. 42). In that respect he said that the person who controls the land controls the development (*id.*). On that score, DiMucci had no direct relationship with Pacella (Tr. 43–44). Instead, pursuant to the Option Agreement, control of the land was in the hands of Wal–Mart (Tr. 44).

64. Black testified credibly [9] that she had no conversations with Schwab between August 27 and September 10 on the subject of GLS continuing as the developer (Tr. 681). She said that at that time Wal–Mart did not want GLS to be the developer (*id.*).

65. Even though Cicero approved the Redevelopment Agreement on September 28 (Tr. 758, DiM.Ex. 62), over a month later Cicero still did not have in hand the leases from Wal–Mart and Home Depot (Tr. 295).

Both was concerned. Although he did not want to start all over, he also did not want Wal–Mart or Home Depot to walk away from the deal, leaving Cicero with a vacant industrial piece instead of a development. In an angry meeting with Filler, Both demanded to see signed leases from Wal–Mart and Home Depot. He told Filler that, if DiMucci did not have a deal with Wal–Mart, it should get out (Tr. 295–97).

66. On November 5 Black wrote to Both (P.Ex. 74) to confirm that Wal–Mart had agreed to enter into a lease with DiMucci and that its terms had been agreed to and reduced to writing. She said that it would be executed the following Monday (November 8) and delivered to DiMucci.

67. Black testified credibly that between September 10 and the date on which the leases were signed she was not aware of anything that occurred as the result of the conduct of GLS that caused the signing of the leases to be delayed (Tr. 716). Black further said that during that period Wal–Mart was not confused as to who the developer was (*id.*).

68. In the same respect, Both testified that he did not believe that Filler said anything about GLS causing a delay in the signing of the leases (Tr. 305). As of that time Both had never met or spoken with Schwab (Tr. 305, 308). Both further testified that both leases were later delivered to him, obviating his concerns (Tr. 297).

69. On November 10 Pacella's attorney Philip Wong ("Wong") wrote Wal–Mart's attorney (see the reference in P.Ex. 80), extending to November 15 the deadline for Wal–Mart to give written notice that it was prepared to open the escrow account. Wong

---

9. It may be noted that her testimony in the respect addressed in this Finding, in contrast with the portions of her testimony that this Court has discredited, did not bear directly on Wal–Mart's liability to GLS. Wal–Mart's recently-filed Wal–Mart II at 6 urges that "GLS cannot have it both ways" by its attacking Black's testimony in some respects and relying on it as supportive in others. But that is just an advancement of the rarely valid "falsus in uno, falsus in omnibus" argument. After all, Black had a strong incentive to dissemble (as she did) to extricate Wal–Mart from its contractual obligation to GLS,

while matters that might at most bear on DiMucci's obviously untenable defenses to its own liability posed a far lesser problem (if any) for Wal–Mart. But it is unnecessary to analyze such matters as though witness Black were picking her way through a minefield in full knowledge of where all of the hidden land mines were buried—witnesses are rarely so sophisticated. Instead Black is typical of most witnesses who seek to shade (or to avoid) the truth—trying to steer clear of the most obvious dangers, while being less aware of others.

testified that the opening of the escrow was extended because Wal–Mart's attorney was waiting for word from Wal–Mart that it was prepared to go forward (Tr. 184–85). At that time Wal–Mart was still in control and could have gone forward with opening the escrow (Tr. 186). Once the escrow was opened, the deposit of funds and "all documents and other items" was required to be made within 15 days (Tr. 183, P.Ex. 8).

70. Pacella testified that before November 16 he was unaware of who the developer of the property was going to be. At that time he was aware only of Wal–Mart. No one from DiMucci had communicated with him or his agents to negotiate or make arrangements to close on the Property (Tr. 189–91).

71. On November 16 Wong wrote a letter to Wal–Mart's attorney, declaring the purchase contract to be in default due to Wal–Mart's failure to provide written notice that it was prepared to open the escrow account (Tr. 178–79, P.Ex. 80). Both Pacella (Tr. 193) and Schwab (Tr. 348) testified credibly that as of the time of that letter they had never spoken to each other. Pacella said that he then did not even know who GLS was (Tr. 193).

72. DiMucci learned of the default when Black faxed Filler a copy of the notice with a "What is this? Please advise ASAP" potation on the cover page (Tr. 74–75, P.Ex. 80). Filler testified that the default letter came as a surprise, as no one had told DiMucci that the option period was running out or had expired (Tr. 78). But he did say, "I think everybody was aware time was running out" (*id.*).

73. According to Pacella, he then just wanted to sell the Property (just as he had wanted to do when the Option Agreement was entered into). At that point, after the termination of Wal–Mart's option, he would still have sold the Property to anyone for $12 million cash (Tr. 193, 200). But to tie up the Property instead of entering into an immediate cash sale, Pacella said that he wanted $500,000 more to compensate him for additional costs caused by the delay (Tr. 191). He said that he would have asked the same terms from anyone who wanted a 90–day

option (Tr. 222, 227). In that respect, Pacella said that DiMucci initially resisted paying any such additional amount (Tr. 227).

74. On December 6 a broker other than Eagle called Schwab and told him that the project was at a standstill, suggesting that Schwab call Pacella. Schwab said that he would not do so until he had written authorization (Tr. 374–75). On the same day Schwab faxed a letter to Pacella stating that his attorney had advised him to have no further conversations about the Property until he received confirmation from the various entities (including DiMucci itself) that DiMucci was out of the picture (P.Ex. 81). In part Schwab's letter said:

> Our interest has never been to interfere with any past, present, or future contracts or agreements binding any of the above parties.

75. Nonetheless Schwab was understandably (and legitimately) concerned about the possibility that an outside developer would come in. That concern stemmed from his related concern that if DiMucci were not the developer, GLS would not get paid at all (Tr. 376–77).

76. On December 7 Pacella wrote Both (Tr. 191, P.Ex. 84) to advise Cicero that the Wal–Mart option had expired and that he was going to seek other buyers. Pacella asked for Cicero's assurance that it would be willing to negotiate a redevelopment agreement with any developer who purchased the Property. Pacella added:

> With the history of the project being as it is, we are no longer interested in negotiating with DiMucci Development for the purchase of our property, under any circumstances.

77. Pacella testified that he wrote that letter because he was "very aggravated with DiMucci and Wal–Mart" and with all the delays and was concerned that an agreement with DiMucci might tie up the property again for a long period (Tr. 193). Still, for $12 million cash he said that he would have sold the property to anyone, including DiMucci (*id.*). By a letter dated the same date (P.Ex. 83), Both responded that Cicero would nego-

tiate a Redevelopment Agreement with the developer who had land control.

78. On December 7 Pacella also faxed a letter to GLS (P.Ex. 82), advising it that the option had expired and that he was seeking offers and proposals for purchase. On the afternoon of December 7 Schwab met with Pacella (with whom he had not previously spoken) for about 20 minutes (Tr. 428–29). Pacella then told Schwab that he would entertain offers from other developers, but that the cost had increased by $500,000 because of Pacella's additional costs in carrying the interest and payment of points each month for extending his agreement (Tr. 349–50). In response Schwab told Pacella that GLS absolutely would not pay any more money, because he was not the one who had caused the delays (Tr. 350, 352). Schwab told Pacella that if GLS were going to be involved, the $12 million deal would have to stand (Tr. 350). Schwab never made an offer to Pacella.

79. On December 8 Schwab spoke with Black and advised her of the situation. That call was intended to explain his justification and to make her aware that he did not think that he was interfering (Tr. 701–02).

80. Two days after Pacella had sent his December 7 letter to Both, DiMucci signed a new Option To Purchase and Purchase Agreement, giving DiMucci an option to purchase the property for $12 million on or before February 15, 1994 (Tr. 180, P.Ex. 99). In accordance with Pacella's demand, that option cost DiMucci $500,000 over and above the option price.

81. There were a number of things done before DiMucci finally closed on the Property. To begin with, DiMucci's Redevelopment Agreement with Cicero was amended on January 7, 1994 (P.Ex. 89).

82. Then on January 24, 1994 Filler wrote Black about several issues that DiMucci believed it needed to resolve before it closed (P.Ex. 90). One of those items was a request for Wal–Mart to acknowledge that the August 27 Letter was null and void, with Filler further stating that DiMucci had no intention of paying GLS anything. On her copy of that letter (P.Ex. 90), Black wrote

"no" as to both of those items. According to her testimony, she told Filler that she believed that DiMucci had an obligation to pay GLS (Tr. 622–23).

83. On January 28, 1994 Schwab wrote Black (P.Ex. 91) to say that DiMucci's attorney had advised GLS' attorney that DiMucci would not pay GLS $250,000 at closing. Schwab reminded Black of the background of their original deal. Schwab's letter referred back to a conversation between him and Black earlier in that month in which GLS had "ultimately agreed, and reluctantly so, to back off the $500,000.00 and accept $250,-000.00 so as not to create problems," as Black had told Schwab that she felt Home Depot would have to take action on GLS' behalf for the other $250,000. Schwab requested written confirmation before closing that GLS would get its $250,000. He said that if GLS did not, he would "have no choice but to instruct Rick Merel to file suit for the $500,000 and the loss of potential profit from our original proforma against all parties to the Letter of Intent" (i.e., Wal–Mart and DiMucci). Here is Schwab's testimony as to that earlier conversation (Tr. 422):

Q: Mr. Schwab, would you please tell us what was said by and between you and Ms. Black, during this telephone conversation in January 1994, regarding the subject which is referred to in Exhibit 91 on the second page?

A: She was trying to get me to accept the $250,000, and I continued to argue the $500,000. And was getting close to when this project was going to close. And my fear was that—

THE COURT: No, just tell us what you said.

THE WITNESS: I said that if she would give us some assurance and would send me something showing that she was going to attach something to the lease or to the final agreement showing how we were going to get paid, that I would—reluctantly I would agree to do that. But I wanted some sort of evidence that that was going to happen.

And here is Black's testimony (Tr. 660–61):

Q: Okay. Now can you tell me what if anything was said during that telephone

conversation regarding the subject of payment of money to GLS?

A: Yes. I told Mr. Schwab about Rick Filler's letter of the 24th whereby he was contending that Mr. Schwab was interfering in his deal—with the deal—and that he was trying to get the letter of intent amended so that DiMucci would no longer be obligated to pay Mr. Schwab his money. Mr. Schwab, once I told him that, he indicated to me that he was going to agree to the 250, because at this point he was afraid he wasn't going to get any money from DiMucci, so he felt that 250 was better than nothing and so he wasn't going to continue pushing for the 500.

\* \* \* \* \* \*

Q: Sure. What if anything did Mr. Schwab say to you during this telephone conversation regarding DiMucci's desire to have you agree that the letter of intent was null and void?

A: Well, of course Mr. Schwab asked me not to agree to that. He didn't feel he had been interfering. And he felt that we should continue with the letter of intent.

This Court credits Schwab's version of the conversation rather than Black's—and because Wal–Mart unquestionably never performed any of the terms on which Schwab had conditioned GLS' reluctant willingness to accept less than it was entitled to as a matter of right, the potential downward modification of the Wal–Mart–GLS oral agreement, which would leave Wal–Mart on the hook for less than the entire $500,000 that it had promised, never took effect.

84. On February 9, 1994 Schwab again wrote Black (P.Ex. 94), requesting an immediate response to information given GLS by DiMucci's attorney that the closing had occurred with no payments being made to GLS by either DiMucci or Wal–Mart. Black admitted that she received, but made no written response to, both the January 28 and the February 9, 1994 letters (Tr. 613–14).

85. On February 15, 1994 Schwab wrote to Peery at Wal–Mart (P.Ex. 97), complaining about Black's failure to provide the protection that she had promised, as well as not following up on the new deals. Schwab asked Peery if he could figure out how to work matters out to everyone's satisfaction. Schwab also testified that in a February 15, 1994 telephone conversation he asked Black, "Are you going to pay me the money? Because you said that you would assure that I would make—would assure that I got paid" (Tr. 385). Schwab said that she then denied that it was her responsibility (*id.*).

### Conclusions [10]

*Jurisdiction*

Total diversity of citizenship exists as between GLS on the one hand and Wal–Mart and DiMucci on the other, taking into account the dual corporate citizenship of each of the three parties under 28 U.S .C. § 1332(c)(1). This Court therefore has subject matter jurisdiction over this action.

*GLS v. Wal–Mart*

What this Court said in Opinion II as to GLS' claim against Wal–Mart based on the latter's oral agreement (the promise made by Black on its behalf) as to the $500,000 to be paid to GLS has been firmly established by the credible evidence introduced during the trial. On Wal–Mart's Rule 56 motion this Court was required only to find that GLS had demonstrated the existence of a genuine issue of material fact. Now GLS has proved the Wal–Mart promise by more than a substantial preponderance of the evidence—indeed it has done so in even more compelling terms than had been assumed in Opinion II at 1389–90. Both Schwab and Harden have provided highly persuasive evidence as to Black's (and hence Wal–Mart's) contractual undertaking, and this Court has discredited

---

**10.** Although written in the different context of Rule 56 motions rather than post-trial legal conclusions, Opinions I and II dealt with the relevant arguments and precedents bearing on the principal material issues now before this Court. Both for that reason and because the results here are really driven by the factual determinations that this Court has made and has already set forth in the Findings, what follows in this *Conclusions* section differs in form from this Court's customary format of setting out numbered conclusions with frequent citations to authorities. Instead the narrative discussion here flows directly and logically from the Findings, without the need to cite authorities for obvious propositions of law based on those facts.

Black's efforts to get out from under that commitment.

None of Wal–Mart's arguments to the contrary is any more persuasive now than they were at the time that this Court dealt with them in Opinion II at 1389–90. At that time this Court properly spoke only of what a factfinder could reasonably determine. Now this Court *is* the factfinder, and it has in fact read all aspects of the case favorably to GLS, in exactly the same manner that it said in Opinion II a factfinder could read them. Everything in the Findings points that way.

▮ Because Wal–Mart has been unsuccessful in challenging the making and enforceability of its promise as to the $500,000 payment to GLS, it seeks to resort to an attempted fallback position: the argument that GLS is limited to a $250,000 claim by Schwab's reluctant cave-in during January 1994, under pressure from Black (see the reference to their earlier conversation in Schwab's January 28, 1994 letter, P.Ex. 91),[11] "to back off the $500,000 and accept $250,000 so as not to create problems." If that were so, of course, DiMucci's unequivocal obligation to pay $250,000 would spare Wal–Mart from any additional liability. But in that regard, even if Black's version of the Black–Schwab telephone conversation were to be credited (as it is not, see Finding 83), Wal–Mart would lose the day.

Black letter law teaches that a promise to do or to pay something that the promisor is already bound to do or to pay provides no consideration for the other party's promise in exchange, so that the other party's promise is not legally enforceable (*White v. Village of Homewood*, 256 Ill.App.3d 354, 356–57, 195 Ill.Dec. 152, 628 N.E.2d 616, 618 (1st Dist. 1993) and cases cited there are exemplary of the "preexisting duty rule" fundamental to the law of contracts). And the flip side of that proposition, which renders equally unen-

forceable a party's agreement (without something more) to accept less than that party's entitlement under an existing contract, is simply reflective of the equivalent principle that there must be separate consideration for the modification of any existing agreement (see, e.g., *Sciarabba v. Chrysler Corp.*, 173 Ill.App.3d 57, 64, 122 Ill.Dec. 870, 527 N.E.2d 368, 373 (1st Dist.1988) and cases cited there). That latter doctrine precludes Wal–Mart from forcing GLS to adhere to Schwab's statement that he would "back off the $500,000"—the amount to which GLS was absolutely entitled under its firm and binding mutual agreement with Wal–Mart.

In an effort to supply the missing ingredient of consideration for that otherwise naked agreement by Schwab to "back off," Wal–Mart urges Black's scenario of the January 1994 telephone conversation in which she depicted Schwab as also having asked her not to agree to DiMucci's request to amend the Letter by deleting the latter's agreement to pay GLS the $250,000. But even were that version accepted (it is not, for Schwab's more credible account of the conversation included nothing as to such a request), it would do Wal–Mart no good. Until the recent decision in *Olson v. Etheridge*, 177 Ill.2d 396, 226 Ill.Dec. 780, 686 N.E.2d 563 (1997) changed long-settled Illinois law in that respect,[12] GLS' third-party-beneficiary entitlement under Letter ¶ (f) was just as vested and impervious to alteration by Wal–Mart or DiMucci or both—that is, in the absence of *GLS'* agreement—as was GLS' entitlement to the $500,000 payment. Hence any threat of the type described by Black (the possible deletion of Letter ¶ (f)) would be equally empty, so that consideration would still be lacking even if she had told Schwab that she would not agree to such deletion. Any such commitment on her part would give GLS nothing

---

**11.** Nothing here should be misunderstood as suggesting that Schwab's conditional surrender was unenforceable on grounds of legal duress. As the text explains, GLS need not confront (let alone surmount) the formidable obstacle of the duress doctrine.

**12.** *Olson* was totally candid in acknowledging that it was reversing a legal doctrine that had

been established for over a century (*id.* at 398, 226 Ill.Dec. 780, 686 N.E.2d at 564):

> *Bay v. Williams*, 112 Ill. 91, 1 N.E. 340 (1884), established the rule in Illinois that the rights of a third-party beneficiary in a contract are subject to immediate vesting and, once vested, cannot be altered or extinguished through a later agreement of the contracting parties without the assent of the beneficiary.

that it did not already have as a matter of law.[13]

In an important sense, however, all of this analysis is really beside the mark. Even if some consideration could somehow be dredged up to support Schwab's cave-in at Black's behest, this Court has found that Schwab's agreement was expressly conditioned on the performance of other undertakings by Wal–Mart—undertakings that the latter never satisfied. Hence Wal–Mart simply cannot extricate itself from liability via the claimed alteration to which Schwab had so reluctantly acceded. And thus Wal–Mart's fallback effort is equally unavailing for more than one reason.

■ Accordingly judgment is ordered to be entered in favor of GLS and against Wal–Mart in the sum of $500,000, plus interest at the rate of 5% per annum (see 815 ILCS 205/2 [14]) from and after the February 1, 1994 date of closing (that interest amount comes to $108,333.33 through the end of May 1998)—or a total judgment of $608,333.33.

*GLS v. DiMucci*

In the *Conclusion* section of Opinion I, 1996 WL 296594, at *5, this Court suggested that a cross-motion for summary judgment by GLS against DiMucci could well have been successful, although none had then been filed. Again the proof of the pudding has been in the eating. As the Findings have conclusively demonstrated, DiMucci breached its absolute and unconditional obligation under Letter ¶ (f) to pay GLS the sum of $250,000 on satisfaction of the financing precondition for closing of the purchase of the property. DiMucci's feeble efforts to counter that determination (for example, by arguing that the Letter was later modified—it was not—or that GLS waived its third party beneficiary rights under the Letter—it did not) do not even meet a legal standard of nonfrivolousness.

Accordingly judgment is ordered to be entered in favor of GLS and against DiMucci in the sum of $250,000, plus interest at the rate of 5% per annum [15] from and after the February 1, 1994 date of closing (an interest amount of $54,166.67 through the end of May 1998)—or a total judgment of $304,166.67. That judgment is ordered to be joint and several with Wal–Mart's judgment obligation (that is, GLS is entitled to no more than a single recovery aggregating $500,000 plus accrued interest).

*Wal–Mart v. DiMucci*

As has just been held, there is no question that DiMucci breached its agreement under Letter ¶ (f) to pay GLS the sum of $250,000 upon the funding of the TIF monies for the project. But Wal–Mart is wrong in its cross-claim that seeks to ascribe to DiMucci all of Wal–Mart's own just-adjudicated $500,000 liability to GLS.

After all, it was Wal–Mart's refusal to honor *its own promise* to GLS that caused Schwab to cave in to the pressure from Black that he should "back off" and take $250,000—rather than the $500,000 to which he was entitled—on certain conditions that he stated to Black. As explained earlier, any arguable modification of that unconditional right would be unenforceable due to a lack of consideration.[16] But even if Schwab's agreement to

---

13. Again as stated in *De Fontaine v. Passalino*, 222 Ill.App.3d 1018, 1028, 165 Ill.Dec. 499, 584 N.E.2d 933, 939 (2d Dist.1991), citing *Moehling v. O'Neil Constr. Co.*, 20 Ill.2d 255, 170 N.E.2d 100 (1960):

> A promise to do something one is already obligated to do is no consideration and creates no new obligation.

Just so, any promise by Black (for Wal–Mart) not to accede to a DiMucci request for a legally ineffective amendment to the Letter in derogation of GLS' then-fully-vested third-party-beneficiary rights would have been a promise to do something that Wal–Mart was already obligated to do: a promise devoid of consideration.

14. Although Wal–Mart's promise was not in writing, this Court holds that it was "withheld by an unreasonable and vexatious delay of payment," so as to trigger the payment of prejudgment interest under the cited statute.

15. Prejudgment interest is payable under 815 ILCS 205/2, both because DiMucci's promise *was* in writing and because its withholding of payment constituted an unreasonable and vexatious delay.

16. As Finding 83 reflects, this Court has credited Schwab's version of the conversation between him and Black in that respect, *not* Black's. And even Black's version, with its reference to

take the lesser amount had somehow proved to be enforceable, Wal–Mart could not fairly take advantage of its *own* breach of contract (by refusing to live up to what it had promised) by claiming additional damages that purportedly stemmed from DiMucci's separate breach in not having paid that lesser amount.

What has just been said is equally true of Wal–Mart's inequitable effort to tag DiMucci with Wal–Mart's attorneys' fees and expenses in having to defend GLS' totally valid claim stemming from Wal–Mart's own breach of contract. DiMucci has characterized that claim, like Wal–Mart's principal cross-claim against DiMucci, as involving unclean hands. Whether or not that equitable description fits, Wal–Mart's cross-claim is unsustainable in that respect as well.

Accordingly, Wal–Mart's claim against DiMucci is denied except in one respect. If and to the extent that GLS were to collect on its judgment against Wal–Mart in an amount in excess of $250,000, plus accrued prejudgment interest and plus a ratable amount of post-judgment interest, Wal–Mart will be entitled to collect the amount of that excess payment from DiMucci.

*DiMucci v. GLS*

DiMucci has submitted an extraordinarily lengthy set of proposed findings of fact and conclusions of law, a substantial part of which have been directed toward its effort to escape its unequivocal liability under the Letter by advancing a counterclaim against GLS. But that amount of bulk cannot conceal the facts that DiMucci's argument—a contention that GLS somehow interfered with DiMucci's closing of the deal with Pacella (by Schwab's asserted breach of his undertaking to give up the Pacella transaction in exchange for the promised $500,000 payment)—not only (1) smacks of the same type

of inequity that DiMucci itself has ascribed to Wal–Mart's cross-claim against DiMucci but also (2) is totally unsupported by the credible evidence in the case. Nor has DiMucci demonstrated any tortious interference by GLS with DiMucci's ability to perform its task as developer of the Property.

All of DiMucci's arguments are totally empty. Any harm that it assertedly sustained by reason of its having failed to get the entire transaction into a posture for the acquisition of the Property before Wal–Mart's option ran out, so that DiMucci ended up having to pay $500,000 more for its own option, is to be laid at DiMucci's own doorstep and *not* that of GLS.

DiMucci is also flat-out wrong in advancing its contention that there was a change in the terms of the Letter under which DiMucci was obligated to pay $250,000 to GLS, which was a clearly and expressly intended third-party beneficiary of the Letter. Nor does anything in *Olson v. Etheridge* call for any change in that conclusion.

In summary, DiMucci's counterclaim against GLS is dismissed with prejudice. Judgment is ordered to be entered in favor of GLS and against DiMucci on that counterclaim.

*Appendix*

In accordance with its objection interposed at trial, Wal–Mart has moved to strike the trial testimony of Richard Merel ("Merel"), a partner in the law firm with which GLS' trial counsel Robert Palmer is associated. Two of Wal–Mart's three grounds for objection fall far short of even specious plausibility, and the third one is without merit as well. Accordingly the objection is overruled for the reasons stated here.

First Wal–Mart points to Illinois Rule of Professional Responsibility 3.7,[1] which (like

Schwab's asking her not to agree to DiMucci's attempt to change the Letter, has the same lack-of-consideration problem. Moreover, if one gives the matter some thought, Black's version is itself suspect—for if Schwab were agreeing to take Wal–Mart's promise that $250,000 rather than $500,000 would be paid, it surely would make no difference to him what the source of that $250,000 would be (whether from DiMucci or from Wal–Mart).

1. This District Court has adopted a substantially equivalent Rule 3.7 as part of its own Rules of Professional Conduct for the Northern District of Illinois. Indeed, this District Court's Rule 3.7(c) provides some added clarification in one respect not involved in this action. Although this is a diversity case, evidentiary determinations are federal in nature, so that if there were any divergence between the two versions (again, there is no difference between them in the context pre-

this District Court's counterpart) bars the lawyer handling a case from testifying except under four specified circumstances (none of which concededly applies to this case). But to advance that objection as to Merel's testimony in this case is itself flat-out unprofessional—for the *very same* Rule 3.7 expressly goes on to make the lawyer-witness prohibition inapplicable where, as here, it is a member of the law firm *other* than the trial lawyer who is testifying. Here is this District Court's Rule 3.7(c):

> (c) Except as prohibited by Rule 1.7 or Rule 1.9 [neither of which is involved here], a lawyer may act as advocate in a trial or evidentiary proceeding in which another lawyer in the lawyer's firm may be called as a witness, and nothing in this Rule shall be deemed to prohibit a lawyer barred from acting as advocate in a trial or evidentiary proceedings from handling other phases of the litigation.

Second, Wal–Mart complains that GLS' answer to Wal–Mart Interrogatory 4 did not list Merel as a "person who was in any way involved in or present during the making of the oral agreement." But Merel's omission from that answer by GLS was 100% correct: Only Schwab and Harden were involved in or present during the *making* of the August 24 oral agreement. Instead Merel testified that he had been a party to some *post-agreement* telephone conversations in which Wal–Mart's Black spoke of her earlier promise and about how she would implement it by making sure that GLS would be paid at the closing. Hence that second argument is also totally groundless.

■ Wal–Mart's third objection is that Merel's testimony did not amount to impeaching Black. That argument, unlike the first two wholly irresponsible assertions, may at least be viewed as permissible advocacy. But it too does not survive analysis. It will be recalled that during her pretrial deposition Black had no recollection as to certain matters, but she then purportedly acquired the ability to recall those matters in time for her trial testimony—in particular, for example, by denying that she had ever made any statement that she would "make sure" that

sented here) this District Court's Rule 3.7 would

GLS was paid. Merel's testimony of having heard Black say just that during the post-agreement, pre-closing telephone communications in which he was also a participant is directly impeaching on that score—indeed, it is highly corroborative of Black's having entered into the oral agreement to which Schwab and Harden testified (the agreement that is the subject of GLS' claim against Wal–Mart) before the conversations that were the subject of Merel's testimony.

In sum, Wal–Mart's motion to strike the Merel testimony is denied. It may be added parenthetically, however, that in this Court's view GLS has established its version of events by a preponderance of the evidence entirely without reference to the Merel testimony (see Finding 51 to the same effect).