FRANK SCIARABBA, Plaintiff-Appellee, v. CHRYSLER CORPORATION, Defendant-Appellant (Northwestern Chrysler-Plymouth Sales, Inc., Defendant).

First District (4th Division)   No. 1—86—3605

Opinion filed June 30, 1988.—Rehearing denied August 18, 1988.

JOHNSON, J., dissenting.

Winston & Strawn, of Chicago (James R. Vogler, Edward J. Wendrow, and E. King Poor, of counsel), for appellant.

Gordon & Gordon, Ltd., of Chicago (Robert E. Gordon, of counsel), for appellee.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The plaintiff, Frank Sciarabba, filed this action against Chrysler Corporation, the manufacturer of Chrysler automobiles, and against

Northwestern Chrysler-Plymouth Sales, Inc., an automobile agency selling Chrysler products located on the north side of the city of Chicago. The lawsuit sought an injunction and an accounting and further sought a judgment in the amount of $55,600, severance pay of $2,000 and attorney fees. This action was filed in March of 1982 and tried before a court without a jury on intermittent dates between May 12 and July 30, 1986. All claims for equitable relief were abandoned prior to the judgment. Judgment was entered in favor of Sciarabba and against Chrysler in the amount of $57,600. The plaintiff's theory against the defendant and the rationale for the judgment are in dispute. There is no judgment against Northwestern Chrysler-Plymouth and it is not a party to this appeal.

Northwestern Chrysler-Plymouth was a dealership owned by Chrysler and operated under a Chrysler program known as the "Marketing Investment" program. Under this program individual investors were able to purchase an equity in a Chrysler dealership by purchasing stock, then operating the dealership with the aim of buying out Chrysler's stock from profits. A dealership is capitalized at a certain level, typically at $400,000 with Chrysler owning 75% of the equity and the investor owning 25%. An audit, referred to as the "buy-in" audit, is performed to verify the dealership's equity and financial condition as of the date of the individual investor's investment. Audits are then performed annually at year end. A "buy-out" audit is performed if the relationship between the operator/investor is terminated to determine each party's equity. The investor also becomes president and general manager of the dealership and supervises its day-to-day operation, including the work and performance of all management employees. Until the investor buys out Chrysler's stock, Chrysler maintains two of its representatives on a three-member board of directors, but does not participate in the day-to-day management of the dealership.

From 1971 to 1979, Sciarabba was in the automobile business, principally in management and supervisory positions in other agencies. In 1979, he decided to participate in Chrysler's marketing investment program through an investment in Northwestern Chrysler-Plymouth. In mid-July, prior to his investment, he began operating Northwestern Chrysler-Plymouth as president and general manager in order to get the feel of the business. Available to him were the dealer financial statements, which he looked at and which showed the amount of working capital for the months immediately prior to Sciarabba's taking over.

On July 19, 1979, Sciarabba entered into a stock agreement with

Chrysler. The stock agreement is the subject of this proceeding. That agreement recited that Chrysler held 1,668 shares of preferred stock with a par value of $166,800 and that Sciarabba had purchased and was the holder of 556 shares of common stock with a par value of $55,600. The agreement stated that the parties desired to provide for the purchase and sale from each other of the stock interest under the terms of the agreement. The agreement further stated that if for any reason Sciarabba ceased to be president of Northwestern Chrysler-Plymouth then Chrysler would repurchase Sciarabba's interest at 25% of Northwestern Chrysler-Plymouth's net worth or $1, whichever was greater. Sciarabba could at any time end his relationship with Chrysler and, subject to the terms of the agreement, receive 25% of the dealership's net worth.

Sciarabba also signed a bonus agreement with Northwestern Chrysler-Plymouth which provided that he was entitled to receive a bonus equal to 25% of the dealership's profits and that any profits were to be used to buy Chrysler's stock interest. Significant to the issue in this case, the bonus agreement provided that the board of directors of Northwestern Chrysler-Plymouth had an absolute right to remove Sciarabba as president and general manager at any time.

A third agreement, called the "Minimum Working Capital Agreement," was entered into between Northwestern Chrysler-Plymouth and Chrysler. Although Sciarabba was not a party to this agreement, it forms the basis of Sciarabba's complaint of misrepresentation. The details of the agreement will be subsequently related.

During Sciarabba's 27-month tenure as president of Northwestern Chrysler-Plymouth there was a total operating loss of $571,205. On October 29, 1981, the board of directors removed Sciarabba as president. Subsequently, he submitted his resignation both as a board member and as president. The book value being less than $1, under the terms of the agreement, Sciarabba was paid $1 for his interest.

The complaint filed on March 3, 1982, alleged that Sciarabba had entered into the stock agreement with Chrysler and that Sciarabba had relied upon the representation of the minimum working capital agreement between Northwestern Chrysler-Plymouth and Chrysler that there was "Net Working Capital of $345,700." In fact there was considerably less than that amount, which was to Sciarabba's detriment. Further, while Sciarabba operated the agency, he lost money because he did not have an adequate working capital. The complaint also alleged that Chrysler used "shady practices" to cause Sciarabba and Northwestern Chrysler-Plymouth to lose money in the operation of the automobile agency. In addition, there was an allegation that

Chrysler coerced Sciarabba into resigning by threatening him and offering him the return of his $55,600 investment.

The trial court entered a judgment in favor of Sciarabba and against Chrysler only. The judgment of $57,600 represented Sciarabba's initial investment of $55,600 plus $2,000 for vacation and severance pay. In rendering the judgment, the court stated that "Plaintiff's amended complaint does not state a claim for fraud." The court commented that the gravamen of the complaint was the "various wrongful acts" as alleged in the plaintiff's complaint. The court found that the plaintiff had "proved the allegations of motive and the various wrongful acts by a preponderance of the evidence," and that those acts were "intended to and did cause the Plaintiff losses of his investment in the dealership." The court also found that the evidence was sufficient to prove the plaintiff resigned as president based on the promise to return the investment. The court stated that "[t]his is also the only reasonable conclusion to draw from the resignation of the Plaintiff." At the conclusion of the findings of the court, the plaintiff sought five days to file an amended complaint. The court inquired whether the plaintiff sought to do this in order to allege fraud, to which the plaintiff responded yes. The court denied the motion to amend.

Sciarabba defends the judgment of the trial court of $55,600 on the basis that Sciarabba was fraudulently induced by Chrysler to enter into the contract to purchase the dealership from Chrysler and also that Chrysler promised to return the investment in return for his resignation. The suggestion of fraud in the inducement with a request for restitution is not made in the one-count complaint nor do we see it suggested at trial. Counsel at trial explained that "[t]he entire theme of this complaint is the fact of what Chrysler did to this man, so he would lose money in the Northwestern Chrysler-Plymouth Sales."

■■ ■ Depending on the facts in the individual case, a person claiming to be the victim of fraud has several options. That person may accept the contract and sue in tort on a fraud theory (*In re Estate of Neprozatis* (1978), 62 Ill. App. 3d 563, 570, 378 N.E.2d 1345), or accept the contract and sue for damages as a result of any breach of contract (*Vance Pearson, Inc. v. Alexander* (1980), 86 Ill. App. 3d 1105, 1112, 408 N.E.2d 782). Another alternative, the one accepted by Sciarabba on appeal, is to contend that he was induced to enter into the contract as a result of fraud and ask to have the contract rescinded and restitution ordered. (*Pinelli v. Alpine Development Corp.* (1979), 70 Ill. App. 3d 980, 1000, 388 N.E.2d 943.) The goal of rescinding the contract and ordering restitution is to place the parties

in the positions they would have been in had they never entered into the contract. (J. Calamari & J. Perillo, Contracts §15—4, at 574 (2d ed. 1977).) Once the substantive basis for the rescission has been proved, that is, in the instant case that Sciarabba was induced to enter into the contract by the fraud of Chrysler and would not have entered into the contract but for the fraud of Chrysler, the plaintiff's recovery would be by way of restitution. Restitution here is an action at law in quasi-contract. (1 G. Palmer, Restitution §3.3, at 235 (1978).) The equitable powers of the court are not necessary in this proceeding.

■ The alleged substantive basis for the relief of rescission here is fraud. The supreme court explained misrepresentation and fraud as follows:

"Broadly speaking, for a misrepresentation to constitute fraud which invalidates a contract, it must be a representation in the form of a statement of a material fact, made for the purpose of inducing a party to act; it must be false and known by the party making it to be false, or not actually believed by him, on reasonable grounds, to be true; and the party to whom it is made must be ignorant of its falsity, must reasonably believe it to be true, must act thereon to his damage, and in so acting must rely on the truth of the statement. [Citations.]" *Wilkinson v. Appleton* (1963), 28 Ill. 2d 184, 187, 190 N.E.2d 727, 729-30.

■ Sciarabba's claim fails for two reasons. First, the trial court itself stated that the complaint did not state a claim for fraud but rather that the complaint was alleging various "wrongful acts." The court further stated that there were various wrongful acts and a motive which caused the plaintiff to lose his investment in the dealership. While the court's statements appear to be addressed to elements of the complaint concerning motives for Chrysler wishing to cause Sciarabba to go out of business, they do not comport with the elements necessary to constitute fraud in the inducement as defined above and which forms the basis of Sciarabba's contention on appeal. Most significantly, in addition to the statements by the court that the complaint did not state a claim for fraud, the trial court refused counsel leave to amend the complaint to allege fraud. We can only construe this as meaning that the court made no finding that there was fraud in the inducement.

Second, in our estimation, the evidence of fraud in the inducement is wanting. Fraud looks to both parties. Here there was no statement made by Chrysler that was known to be false and there was no state-

ment that Sciarabba reasonably believed to be true. The specific allegation in the complaint was that the minimum working capital agreement states that Northwestern Chrysler-Plymouth "now has actual Net Working Capital of $345,700" and that Sciarabba relied on this representation in entering into the agreements. The minimum working capital agreement is dated September 24, 1979, and was received by Sciarabba then, more than two months after Sciarabba had entered into the contract with Chrysler that he said he would not have entered into but for the misrepresentation in the minimum working capital agreement. Although not specifically alleged in the complaint, Sciarabba testified that Chrysler's representative, Robert Janis, in the first part of July 1979, said that the capitalization was $345,000. At another point Sciarabba stated that capitalization "was to be" $345,000.[1] Janis denies making any such statement concerning the working capital.

The precise legal issue framed in this appeal is not whether or not there existed that amount of working capital when the alleged misrepresentation was made, but whether Chrysler falsely represented that it had that amount of working capital at that time and whether Sciarabba relied upon that representation. Chrysler contends that there was no representation that there existed that amount of working capital at that particular time and further that Sciarabba knew that there was not that amount of working capital. Working capital fluctuates from month to month and is not known exactly until an audit is completed after that time. Sciarabba had seen the dealer financial statements before he entered into the agreement and knew that the working capital fluctuated. Those statements showed that in April 1979, the working capital was $309,535, in May 1979, $130,457, and in June 1979, $287,872. The figure of $345,000 that Sciarabba relies upon emanates from a balance sheet in a dealership operational forecast dated July 10, 1979. The balance sheet states that it is "pro forma." Sciarabba testified that to him *pro forma* meant that it was a projection. (See *Niemoth v. Kohls* (1988), 171 Ill. App. 3d 54, for a discussion of the term "pro forma" as applied to financial statements.) As an indication that figures in the balance sheet were not meant to be actual figures, the balance sheet shows that there were no current liabilities. The actual balance sheet for the months preced-

[1]Illinois does not allow recovery for promissory fraud, that is, fraud based on a false representation of intention of future conduct unless that promise is part of a scheme. *Stamatakis Industries, Inc. v. King* (1987), 165 Ill. App. 3d 879, 520 N.E.2d 770.

ing the *pro forma* balance sheet shows current liabilities in the hundreds of thousands of dollars. Correspondingly, the *pro forma* balance sheet does not indicate the total amount of assets which from prior statements is also in the hundreds of thousands of dollars. Sciarabba at one time testified that he knew that the dealership was undercapitalized at the time and that it did not have $345,700. As an indication that there was no intent to misrepresent the capitalization, the evidence showed that on August 1, 1979, 13 days after Sciarabba invested, Chrysler contributed $42,000 and then contributed an additional $53,500 in December 1979. After the audit was completed in April 1980, Chrysler contributed another $176,000. This was not sufficient evidence that Chrysler knowingly made a false statement of material fact which Sciarabba reasonably believed to be true.

The alternative finding of the court was that Sciarabba resigned as the dealership's president based on a promise made that Chrysler would return his investment. The trial court stated that that was the only reasonable conclusion to draw from the resignation of the plaintiff. Chrysler contends that the person who allegedly made the promise had no authority to do so and that there was no consideration for the alleged modification of the stock agreement.

■ We do not believe that there was any consideration for the oral modification of the stock agreement. To support modification there must be consideration. (*Schweickhardt v. Chessen* (1928), 329 Ill. 637, 161 N.E. 118; *Chicago College of Osteopathic Medicine v. George A. Fuller Co.* (7th Cir. 1985), 776 F.2d 198; J. Calamari & J. Perillo, Contracts §5—14, at 192 (2d ed. 1977).) The board of directors of Northwestern Chrysler-Plymouth under the express terms of the bonus agreement had a right to remove Sciarabba as president and member of the board at any time. The promise to do something which one is already legally obligated to do is no consideration and creates no new obligation. *Moehling v. W. E. O'Neil Construction Co.* (1960), 20 Ill. 2d 255, 266, 170 N.E.2d 100.

Accordingly, the judgment of the circuit court in the amount of $55,700 is reversed.

■ Chrysler contends that the court was in error in awarding Sciarabba $2,000 for vacation and severance pay. This issue arises in somewhat of an unusual manner. The amended complaint makes no mention of the facts surrounding any requirement that Chrysler pay Sciarabba $2,000 as vacation and severance pay. The only mention of this in the complaint is in the request for relief, which seeks $2,000 as severance pay. The record shows that the board of directors of Northwestern Chrysler-Plymouth promised Sciarabba a certain amount of

money. There are no other circumstances concerning that promise involving other automobiles that do not bear on the legal issue here, which concerns only Chrysler. Sciarabba points to no legal theory which would support any judgment against Chrysler in this amount of money. Consequently, the judgment for $2,000 is reversed.

Chrysler also contends that it was entitled to a new trial because it had been deprived of its right to a jury trial. Chrysler asserts that Sciarabba never established any right to equitable relief and that the relief granted was based only on a claim at law. We will not address this issue because Chrysler has received relief in the form of a reversal, whereas a ruling in its favor on this court would merely result in a remand for a new trial.

The judgment of the circuit court is reversed.

Reversed.

McMORROW, J., concurs.

JUSTICE JOHNSON, dissenting:

I respectfully dissent from the majority's reversal of the trial court's judgment in favor of plaintiff for $57,600. An award of damages in a bench trial should not be disturbed on appeal unless it is against the manifest weight of the evidence. (*Hough v. Mooningham* (1986), 139 Ill. App. 3d 1018, 1023.) Additionally, "in a bench trial it is within the province of the trial court to determine the credibility and weight of the testimony, to resolve the inconsistencies and conflicts, and to render its decision accordingly [citation]." (*MBL (USA) Corp. v. Diekman* (1983), 112 Ill. App. 3d 229, 235.) Moreover, in *Amadeo v. Zant* (1988), 486 U.S. ___, 100 L. Ed. 2d 249, 108 S. Ct. 1771, the United States Supreme Court reaffirmed the deference that must be accorded the fact finder. The Court held that " '[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' [Citations.]" (*Amadeo*, 486 U.S. at ___, 100 L. Ed. 2d at 262, 108 S. Ct. at 1778, quoting *Anderson v. Bessemer City* (1985), 470 U.S. 564, 574, 84 L. Ed. 2d 518, 528, 105 S. Ct. 1504, 1511.) Here, the fact finder's determination was supported by sufficient evidence in the record and, consequently, I would affirm.