**ALLIANZ INSURANCE COMPANY, et al., Appellants–Defendants,**

v.

**GUIDANT CORPORATION, et al., Appellees–Plaintiffs.**

No. 49A05–0704–CV–216.

Court of Appeals of Indiana.

April 17, 2008.

Rehearing Denied June 26, 2008.

Richard A. Smikle, Andrew J. Miroff, Brian J. Paul, Ice Miller LLP, Indianapolis, IN, Lazar P. Raynal, Geoffrey A. Vance, McDermott Will & Emery LLP, Chicago, IL, Attorneys for Appellant, Allianz Insurance Co.

John David Hoover, Sean T. White, Hoover Hull, LLP, Indianapolis, IN, J.C. Ditzler, Melissa O'Loughlin White, Cozen O'Connor, Seattle, WA, Attorneys for Appellants, The Excess Insurers.

George M. Plews, Jeffrey D. Claflin, Todd Janzen, Plews Shadley Racher & Braun, Indianapolis, IN, G. Andrew Lundberg, Mary Rose Alexander, Latham & Watkins LLP, Chicago, IL, Attorneys for Appellees.

## OPINION

BAKER, Chief Judge.

At the heart of this monstrosity of a litigation that has crossed state lines and caused all parties to behave inexplicably at times, is a fairly straightforward dispute about when and whether an insurer's duty to defend has been triggered. We confess our frustration that the parties have forced the Indiana courts to take part in a race to the finish with the courts of Illinois.

Appellants-defendants Allianz Insurance Company (Allianz) and others (the Excess Insurers) (collectively, the Insurers) appeal the trial court's orders (1) granting partial summary judgment in favor of appellees-plaintiffs Guidant Corporation (Guidant) and others (collectively, the Policyholders) on the Policyholders' claim that the Insurers breached their duty to defend; and (2) striking an affidavit and attached exhibits supporting the Insurers' opposition to summary judgment.

Additionally, the Policyholders cross-appeal the trial court's order denying their motion for judgment on the pleadings on Allianz's affirmative defense of fraud. They argue that inasmuch as Allianz has elected not to rescind the contract and has retained all premiums paid pursuant to the insurance policy at issue, it has waived an argument that the policy is void due to alleged fraud. Finding that the trial court erroneously denied the Policyholders' motion for judgment on the pleadings and erroneously granted partial summary judgment in favor of the Policyholders, we reverse and remand for further proceedings consistent with this opinion.

*PRELIMINARY ISSUE:*
*PUBLIC ACCESS* [1]

As Justice Brandeis once remarked, sunlight is the best disinfectant. *Buckley v. Valeo,* 424 U.S. 1, 67, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (quoting L. Brandeis, Other People's Money 62 (Nat'l Home Library Found. ed. 1933) ("Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.")) Indiana Administrative Rule 9 governs public access to court records. The rule

> starts from the presumption of open public access to court records. In some circumstances; however, there may be sound reasons for restricting access to these records. This rule recognizes that there are times when access to information may lead to, or increase the risk of, harm to individuals. However, given the societal interests in access to court records, this rule also reflects the view that any restriction to access must be implemented in a manner tailored to serve the interests in open access.

Ind. Administrative Rule 9(A) commentary. Administrative Rule 9(H) sets forth the procedures to be followed by litigants and the trial court if one or more parties desire that certain information be shielded from public access:

(1) A *verified written request* to prohibit public access to information in a court record, may be made by any person affected by the release of the information. The request *shall* demonstrate that:

  (a) The public interest will be substantially served by prohibiting access;

  (b) Access or dissemination of the information will create a significant risk of substantial harm to the requestor, other persons or the general public;

  (c) A substantial prejudicial effect to on-going proceedings cannot be avoided without prohibiting public access, or;

  (d) The information should have been excluded from public access under section (G) of this rule.

The person seeking to prohibit access has the burden of providing notice to the parties and such other persons as the court may direct, providing proof of notice to the court or the reason why notice could not or should not be given, demonstrating to the court the requestor's reasons for prohibiting access to the information. A party or person to whom notice is given shall have twenty (20) days from receiving notice to respond to the request.

(2) A court may deny a request to prohibit public access without a hearing. *If the court does not initially deny the request, it shall post advance public notice of the hearing.* A court may grant a request to prohibit public access *following a hearing* if the requestor demonstrates by clear and convincing evidence that any one or more of the requirements of (H)(1)(a) through (H)(1)(d) have been satisfied. An order prohibiting public access to information in a court record may be issued by the court having jurisdiction over the record. An order prohibiting public access to information in bulk or compiled records, or in records under the jurisdiction of multiple courts may be issued only by the Supreme Court.

**1.** We held oral argument in Indianapolis on March 25, 2007. We thank counsel for their oral and written presentations.

(3) The court *shall* balance the public access interests served by this rule and the grounds demonstrated by the requestor. *In its order, the court shall state its reasons for granting or denying the request. If the court prohibits access, it will use the least restrictive means and duration.* When a request is made to prohibit public access to information in a court record at the time of case initiation, the request and the case information will remain confidential for a reasonable period of time until the court rules on the request. When a request is made to prohibit public access to information in court records that are already publicly accessible, the information may be rendered confidential for a reasonable period of time until the court rules on the request.

(4) This section does not limit the authority of a court to seal court records pursuant to Ind.Code § 5-14-3-5.5.

Admin. R. 9(H) (emphases added).

■ In this case, the parties explained at oral argument that the trial court entered a protective order that essentially sealed the entire case from public view. Although there is nothing inherently improper about such an order, here, the trial court neglected to hold a public hearing first, as required by Rule 9(H)(2). In all likelihood, the trial court decided not to do so because the parties agreed to the confidentiality of the litigation. The rule, however, does not include an exception for such a circumstance. Indeed, it is in precisely such a situation that a public hearing and a trial court's thoughtful weighing of the interest of public access against the parties' joint request are sorely needed, because in their absence, there is no advocate for sunlight. Thus, the trial court's order sealing the litigation from public view violated Administrative Rule 9(H) and was thereby improper.

Moreover, our review of the record, the briefs, and the issues has revealed *no* confidential information to which we need refer in resolving this appeal—which, at its heart, is a contractually-based insurance coverage dispute. Therefore, we need not and will not restrain ourselves—even in this public forum—from a full description of the facts, the parties' arguments, and our resolution thereof.

## FACTS

### The Ancure Device

The Ancure Device was developed by Endovascular Technologies, Inc.(EVT), a subsidiary of Guidant since 1997 and one of the plaintiffs herein. In September 1999, the Food and Drug Administration (FDA) approved the Ancure Device for sale. The device is a synthetic vascular graft used to repair abdominal aortic aneurysms. Specifically, it is a Y-shaped graft that is inserted inside the major aortic blood vessel to support a weakened vessel wall at the point where it branches into the legs.

### The Policy

Allianz began providing insurance coverage to the Policyholders in 1997. At issue in this appeal is coverage that the Insurers provided to the Policyholders between September 1, 2000, and September 1, 2001 ("Year One" of coverage). In July 2000, the Policyholders provided Allianz with a completed application for Year One coverage, and the application represented, among other things, that the Policyholders were unaware of any defect in one of their products that might give rise to liability in excess of $2 million. After receiving and approving the application, Allianz issued a "claims made" commercial umbrella liabili-

ty insurance policy for Year One (the Policy).

■ The Policyholders' coverage for product liability claims in Year One, including any entitlement to a defense from its Insurers, is subject to a self-insured retention (SIR)[2] of $5 million per occurrence and $8 million in the aggregate. Consequently, the Policyholders must have borne either $5 million per occurrence or $8 million in the aggregate to trigger any of the Insurers' obligations, including the duty to defend. The Policy includes a Batch Clause, which provides as follows:

> The term "batch" means all products which have the same known or suspected defect or deficiency which is identified by the same advisory memorandum. The term "advisory memorandum" is any communication issued by you to inform health professionals or other appropriate persons or firms of a risk of "bodily injury" or "property damage" from a product in use[.]

> Coverage does not apply to any loss, claim or "suit" which arises out of a defect or deficiency which was known or suspected prior to the retroactive date shown in this policy[.]

> When this endorsement is attached to your policy, all losses arising from a single "batch" of your product will be considered to be one "occurrence[.]" Therefore, when multiple losses are considered to be one "occurrence" you must only meet a single "self insured retention" amount[.] Likewise, our limit of liability due to "bodily injury" and "property damage" is limited to that of a single "occurrence[.]"

All claims made by persons or organization[s] seeking [damages] because of "bodily injury" or "property damage" arising out of one batch will be deemed to have been made at [the time] the first of those claims is made against you[.]

Allianz App. p. 264.

### The Recall

On March 16, 2001, Guidant announced a voluntary recall of all unused Ancure Devices and suspended further sales of the device. The FDA subsequently initiated an investigation into EVT regarding its failure to make certain disclosures about the device's performance. On June 9, 2003, the United States of America charged EVT with one felony count of making false statements to a government agency in connection with an FDA inspection and nine felony counts of intentionally and fraudulently shipping nine misbranded Ancure Devices in interstate commerce. On June 12, 2003, EVT pleaded guilty as charged.

### The Illinois and Indiana Lawsuits

On November 6, 2003, Allianz filed a complaint against Guidant in Illinois (the Illinois Action) seeking damages and rescission of the Policy for fraud based on Guidant's representations in the Policy application. The complaint also sought a declaratory judgment that the Policy does not provide coverage for claims, losses, or liabilities related to the Ancure Device.

On November 8, 2003, the Policyholders filed the complaint at issue in this appeal against the Insurers (the Indiana Action), alleging that the Insurers had breached

---

**2.** A SIR is similar to a deductible. As explained by the Policyholders, "[a] policy with a deductible obliges the insurer to respond to a claim from 'dollar one' (i.e., immediately upon tender), subject to the insurer's right to later recoup the amount of the deductible from the insured. A policy subject to a SIR, in contrast, obliges the policyholder itself to absorb expenses up to the amount of the SIR, at which point the insurer's obligation is triggered." Policyholders' Br. p. 5 n. 4.

their duties to defend and indemnify the Policyholders for losses stemming from the Ancure Device and seeking a declaration that they are entitled to coverage for those losses. Faced with the competing actions, in May 2004 the trial court, then the Honorable David Dreyer,[3] herein stayed this action while the parties awaited the outcome of Allianz's fraud claim in the Illinois Action:

> Comity is best exercised if the Illinois court resolves Allianz's fraud claim against Guidant in Illinois, and Guidant can subsequently seek coverage from Allianz, and other insurers, in Indiana. Therefore, the [coverage] claims against Allianz should remain in Indiana [but be stayed] pending an Illinois resolution of the fraud claim.

> The court acts with confidence that the Illinois court, and the parties, will respect this Court's finding of comity, and further litigate this matter accordingly.

Guidant App. p. 16. Eventually, however, the Illinois court deemed the Illinois Action to be a contract coverage case, meaning that the parties were litigating contract issues and the fraud claim therein. In response, in the Indiana Action, the Policyholders filed a motion to enjoin the Insurers from litigating contractual coverage issues in the Illinois Action. The trial court denied the injunction request but lifted the stay it had imposed previously:

> The most important factor of comity is *uniformity.* Originally, this Court determined how subsequent proceedings would cause the least conflict.

---

**3.** Judge Dreyer was peremptorily removed from this action in December 2005. Since then, the Honorable S.K. Reid has presided over the action.

**4.** The trial court herein explained that

\* \* \*

... But subsequently, the Illinois court decided on its own to declare the Illinois case a "coverage" case. The [Excess Insurers] continued to intervene in Illinois despite this first-filed case in Indiana, the Court's comity finding, and its confidence in the parties' accord. This Court can no longer maintain comity since comity has not engendered the uniformity for which it was ordered.

\* \* \*

Indiana law likely applies, and comity is not effective.... Although there is some merit and equity in [the Policyholders'] request to enjoin the [Insurers] in Illinois, the record in both states suggests that the risks and disadvantages of a race to judgment are still preferable to a multi-year, multi-state procedural debacle.

Policyholders' App. p. 43 (emphasis in original).

### The Summary Judgment Ruling in Illinois

On March 10, 2006, the Insurers filed a motion for partial summary judgment regarding coverage for Year One in the Illinois Action. Specifically, the Insurers argued that (1) the Policyholders had not satisfied the applicable SIR because neither of the two Ancure claims actually made during Year One had satisfied the SIR, and (2) the Batch Clause had not been triggered, so losses on claims made after Year One could not be aggregated with those actually made in Year One to exhaust the SIR for that year.[4] On June

---

[t]he universe of underlying Ancure claims against the Policyholders involving pre-recall Ancure devices—not all of which claims have resulted in lawsuits—comprises:

12, 2006, the Illinois court granted the Insurers' motion, finding that the Batch Clause did not apply and, consequently, the Policyholders had not exhausted the SIR for Year One. Thus, coverage requirements were not triggered for that period of time. The Illinois court did not state that the partial summary judgment order was final and appealable and none of the parties requested that it do so. Thus, litigation on the remaining claims continued in Illinois.

### The Summary Judgment Ruling in Indiana

In the Indiana Action, on September 26, 2006, the Policyholders moved for partial summary judgment on their claim that Allianz[5] had breached its duty to defend. On December 21, 2006, the Policyholders moved for judgment on the pleadings on Allianz's fraud defense. On January 2, 2007, Allianz filed a brief in opposition to summary judgment, attaching the affidavit of John P. Killacky (the Killacky Affidavit), which, in turn, had nine exhibits attached thereto. The Killacky Affidavit supported the Insurers' fraud defense, and the Policyholders eventually moved to strike the affidavit. The Insurers also filed their own motion for partial summary judgment on the Batch Clause/SIR issues, advising the trial court that they were the same issues that had already been litigated in Illinois but not going so far as to say that the Illinois ruling should have been given preclusive effect.

- Two claims ... made via pre-suit complaints asserted in writing during Year 1 of the Allianz Policy ...;
- 14 claims made between December 2001 and August 2002, and thus during Year 2 of the Allianz Policy; and
- More than a hundred further claims involving pre-recall Ancure devices that were made against the Policyholder after

The Insurers had served a number of deposition notices on the Policyholders relating to the Insurers' fraud defense. On November 9, 2006, the Policyholders requested a protective order to quash the notices and on December 14, 2006, the trial court entered a protective order, prohibited the Insurers from taking the depositions, and ordered that the notices be converted into interrogatories to be answered in February 2007—after the Insurers' brief in opposition to summary judgment was due.

On March 23, 2007, the trial court entered four orders, three of which are being appealed herein. First, it denied the Insurers' motion for partial summary judgment on coverage issues relating to the Year One SIR, finding as follows:

> The Court finds as a matter of law based upon the uncontroverted material facts that coverage for at least some Ancure claims was triggered in Year 1 by operation of the Batch Clause....

> First, the Court finds that the Batch Clause provides coverage for claims arising from a batch of products, regardless of whether the claims for which coverage is sought allege the same or different product "defects or deficiencies."... The Policyholders have ... shown through uncontroverted evidence that the $5 million per-occurrence SIR applicable in Year 1 has been exhausted as to claims arising from that batch of products.

the September 1, 2002[,] termination date of the Allianz Policy.
Allianz App. p. 49.

5. The motion was directed only at Allianz, but the Excess Insurers opposed the motion and are taking part in the appeal "to dispute the Policyholders' interpretation of the Allianz Policy to which their policies follow form." Allianz App. p. 48 n. 3.

* * *

Second, and in the alternative, even if the Court did not accept the Policyholders['] reasonable interpretation of the language of the Batch Clause, and then found the clause to be ambiguous, ... such ambiguity ... would be constructed against the Insurers and in favor of coverage....

Third and also in the alternative, the Insurers' motion must be denied in all events, because the Policyholders have raised genuine issues of material fact as to whether one or more "batches" ... existed, or may yet exist, that would trigger coverage for the Year 1 claims even under the Insurers' reading of the Batch Clause.

Policyholders' App. p. 2535–37. The trial court acknowledged the contrary ruling in the Illinois Action, stating "[w]ith due respect, this Court is unable to concur in [the Illinois court's] construction of the Batch Clause." *Id.* at 2542. Additionally, in this order (the Batch Clause Order), the trial court acknowledged its simultaneous but separate order ruling on the Policyholders' summary judgment motion, noting that

[t]hat motion and the instant motion present certain overlapping issues regarding coverage under Year 1 and the 'Batch Clause' contained in the subject policies. Accordingly, for the sake of completeness, all findings and conclusions set forth in the Order granting the Policyholders' [partial summary judgment motion] are incorporated by reference in this Order, and vice versa.

*Id.* at 2531 n. 2. The Insurers have not appealed the Batch Clause Order.

Second, the trial court entered an order striking the Killacky Affidavit (the Killacky Affidavit Order), finding as follows:

1. The Killacky Affidavit includes numerous statements that do no more than reflect the "transparent contentions,"

"mere pleading allegations" and "self-serving unverified statements of fact" expressly disapproved of by the Indiana Supreme Court....

2. The Killacky Affidavit includes criticisms of the Policyholders' discovery responses. This testimony extends well beyond "facts" based upon Mr. Killacky's "personal knowledge"....

3. The Killacky Affidavit also contains inadmissible opinion testimony. Mr. Killacky may not offer opinion testimony because he has not been qualified as an expert in this matter....

4. Allianz's reliance on *Reeder v. Harper*, 788 N.E.2d 1236 (Ind.2003)[,] is clearly misplaced. *Reeder* does not hold, as Allianz contends, that inadmissible evidence contained in an affidavit is properly considered on summary judgment because the evidence might one day be competently testified to at trial.

* * *

The Supreme Court did not rule, as Allianz contends, that an affidavit lacking foundation is admissible at the summary judgment stage.

Allianz App. p. 64–66 (internal citations omitted). The Insurers now appeal the Killacky Affidavit Order.

Third, the trial court entered an order granting the Policyholders' motion for partial summary judgment against Allianz on their claim for breach of the duty to defend (the Summary Judgment Order). Initially, the Summary Judgment Order includes a footnote explicitly incorporating the findings and conclusions from the Batch Clause Order. Among other things, the trial court also held that

[t]he duty to defend is present where the allegations against the policyholder establish merely the possibility of its sustaining a covered liability. Once the

duty arises, it continues unless and until the insurer is able to show that the potential no longer exists—either because the policyholder is exonerated of liability to the underlying claimant, or because the insurer can prove as a matter of law that any liability that might be sustained by the policyholder would not be within the indemnity coverage afforded by the policy.

*Id.* at 54 (citation omitted). In responding to the Insurers' argument that discovery had not been completed at the time it ruled on the motion, the trial court explained that "[i]nherent in the notion of the duty to defend being triggered by the mere potential for coverage is the fact that an insurer will sometime[s] be called upon to perform that duty before all of the facts bearing on its indemnity obligation are known." *Id.* Moreover,

no authority suggests that an insurer who has investigated a claim (as Allianz did here) to the point of concluding that there is no potential for coverage, and thereupon denied coverage outright, is entitled to an indefinite period of *post-denial* discovery in which to gather additional information supporting its denial in hindsight.

*Id.* at 55 (emphasis in original). Ultimately, the trial court concluded "that the uncontroverted material facts as a matter of law establish both the potential for coverage and the exhaustion of the SIR, and thus the existence of the duty to defend." *Id.* at 55–56. The Insurers now appeal this order.

Fourth, the trial court denied the Policyholders' motion for judgment on the pleadings on Allianz's fraud defense (the Fraud Order). The trial court found that Indiana law should apply to resolve the dispute and ultimately concluded that questions surrounding the Policyholder's alleged fraud are best answered by a trier of fact. The Policyholders now cross-appeal this order.

## DISCUSSION AND DECISION

### I. The Insurers' Fraud Defense

First, we will address the Policyholders' cross-appeal of the trial court's order denying their motion for judgment on the pleadings with respect to the Insurers' fraud defense. We review a trial court's ruling on a motion for judgment on the pleadings de novo and will grant the motion only if it is clear from the face of the complaint that under no circumstances could relief be granted. *Auto–Owners Ins. Co. v. Eakle,* 869 N.E.2d 1244, 1248 (Ind.Ct.App.2007), *trans. denied.*

■ The Policyholders argue that because the Insurers elected not to rescind the Policy and retained the premiums received pursuant thereto, the Insurers may not argue successfully that the Policy is void because of alleged fraud. In other words, by retaining the consideration received for the Policy, Allianz has necessarily waived the right to raise fraud—and argue that the contract is void—as a defense as a matter of law.

■ It is well settled in Indiana that "[g]enerally, a party bringing an action for fraud in the inducement must elect between two remedies. One alternative is to rescind the contract, return any benefits received, and be returned to the status quo. The other alternative is to affirm the contract, retain the benefits, and seek damages." *Lightning Litho, Inc. v. Danka Indus., Inc.,* 776 N.E.2d 1238, 1241 (Ind.Ct.App.2002) (citations omitted). When a party elects to affirm a contract induced by fraudulent misrepresentations, the party may only seek tort damages. *Id.*

■ The Policyholders argue, and we agree, that a party seeking relief on the

basis that it was fraudulently induced to enter into a contract is bound to treat the contract as entirely invalid. It may not choose certain provisions to affirm and certain provisions to reject. *Barrington Mgmt. Co., Inc. v. Paul E. Draper Family Ltd. P'ship*, 695 N.E.2d 135, 142 (Ind.Ct. App.1998) (holding that "[t]he party rescinding a contract must repudiate the part of the contract which is beneficial to him as well as that part of the contract which is not" and that a party "must affirm or avoid the contract in whole and cannot treat it as good in part and void in part").

Here, although Allianz initially pleaded an affirmative defense of rescission, it ultimately elected to withdraw that defense and has retained the premiums received from the Policy. Thus, it has affirmed the contract, and this affirmation necessarily precludes the Insurers from pursuing a fraud defense.

Allianz argues that our Supreme Court implicitly overruled decades of Indiana precedent and created a right of partial rescission in *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664 (Ind.1997). In *Guzorek*, after the policyholders got into an automobile accident, the insurer canceled the policy—and tendered all premiums received to the trial court—on the basis of the insured's concealment in applying for the policy that her husband, who was driving at the time of the accident, was a regular operator of the vehicle. The court faced the issue of whether an insurer's common law right to rescind coverage based on fraud survived the enactment of financial responsibility laws requiring drivers to carry insurance or other proof of financial responsibility. Ultimately, the *Guzorek* court concluded that insurers are permitted, under certain circumstances, to rescind automobile liability coverage,

though the court cautioned that its ruling was a limited one. *Id.* at 671–72.

The court then discussed, in what the Policyholders insist was dicta, different ways in which the law of rescission might apply in a future case with different facts:

> Under one definition [of "material misrepresentation"], a misrepresentation or omission is "material" if knowledge of the truth would have caused the insurer to refuse the risk or to charge a higher premium for accepting the risk.... A second approach to materiality in a case, such as this, where rescission is attempted after a loss has been incurred, would measure the materiality not against the underwriting decision, but rather against the loss. *In other words, coverage of the incurred loss would be voided if the misrepresentation affected that risk, but not all coverage would necessarily be voided.* Under either view, the materiality of the representation or omission is a question of fact to be resolved by the factfinder unless the evidence is such that there can be no reasonable difference of opinion.

*Id.* at 672–73 (emphasis added). The *Guzorek* court cited no authority for its second approach to the issue. In fact, the court explicitly went on to state that "the parties do not address and we do not decide whether the law would permit complete rescission of the policy or only reformation to conform to the facts represented in the application." *Id.* at 674.

It is apparent that "the law" to which the court was referring was the financial responsibility law, not contract law, because general contract law plainly permits the complete rescission of a contract. Therefore, "*Guzorek*'s musing thus could not have been intended as indicating a view on the entirely different issue of whether the *general law of contract* permits *partial* rescission." Policyholders'

Br. p. 45 (emphases in original). *Guzorek* did not address the many cases outside of the automobile insurance context holding that a party alleging fraud in the inducement must either affirm or rescind the contract in full. Indeed, *Guzorek* did not present a question regarding partial rescission, inasmuch as the insurer had declared its intent to rescind the entire contract by tendering the premiums to the trial court. The court ultimately held that the insurer could rescind the policy in its entirety and did not address whether partial rescission was possible. Here, in contrast, the Insurers seek to retain *all* premiums and rescind only part of the Policy.

We believe that if the *Guzorek* court had intended to overrule decades of well-established contract law, it would have done so explicitly and carefully. Furthermore, in the decade following *Guzorek*, this court has continued to apply the election of remedies doctrine in the rescission context with no suggestion that *Guzorek* placed it in doubt. *See, e.g., America's Directories Inc., Inc. v. Stellhorn One Hour Photo, Inc.*, 833 N.E.2d 1059, 1068 (Ind.Ct.App. 2005); *Smith v. Brown*, 778 N.E.2d 490, 496 (Ind.Ct.App.2002); *but see Safe Auto Ins. Co. v. Farm Bureau Ins. Co.*, 867 N.E.2d 221, 223–24 (Ind.Ct.App.2007) (holding that "[a]s the [*Guzorek*] court both set out and applied two distinct tests of materiality, we cannot say that the second approach is dictum"), *trans. denied.* Under these circumstances, we decline to find that *Guzorek* overruled decades of well-established precedent that partial rescission is not an option for a party alleging fraud. Thus, pursuant to Indiana law, the Insurers are precluded from raising a fraud defense and the trial court should have granted the Policyholders' motion for judgment on the pleadings.

■ Allianz argues that we should apply Illinois, rather than Indiana, law to this issue. We need not reach the choice of law debate, however, inasmuch as we find that Illinois, like Indiana, does not provide for partial rescission as a remedy for a party alleging fraud. In Illinois, as in Indiana,

> "[t]he general rule is that the defrauded person may elect to accept the situation created by the fraud and seek to recover his damages, or he may elect to repudiate the transaction and seek to be placed in status quo.... The rule is based on the recognition that the remedies are inconsistent and that the plaintiff by his conduct or election makes only one of such remedies appropriate under the circumstances."

*Ransburg v. Haase*, 224 Ill.App.3d 681, 167 Ill.Dec. 23, 586 N.E.2d 1295, 1301 (.1992) (quoting *Walsh v. Oberlin*, 2 Ill.App.3d 987, 276 N.E.2d 728, 730 (1971)); *see also Sciarabba v. Chrysler Corp.*, 173 Ill.App.3d 57, 122 Ill.Dec. 870, 527 N.E.2d 368, 371 (1988) (holding that a person alleging fraud has three options: (1) accept the contract and sue in tort on a fraud theory; (2) accept the contract and sue for damages for any breach of contract; or (3) rescind the contract and seek restitution).

In support of its position, Allianz relies on two federal court district decisions that, in our view, misinterpret Illinois law. In *TIG Insurance Co. v. Reliable Research Co.*, the court granted an insurer's claim for rescission of the policy, noting that under Illinois law, "the purpose of rescission is to return the parties to the status quo," and ordered the insurer to return to the policyholder all premiums paid for the policy. 228 F.Supp.2d 921, 929 (S.D.Ill. 2002), *aff'd by* 334 F.3d 630 (7th Cir.2003) (affirming rescission of the entire policy). Thus, although the court did state that Illinois law does not require "return of the consideration for the contract as a condition precedent to bringing suit," *id.*, its

ultimate holding required the return of all premiums. Moreover, the only Illinois case cited by the *TIG* court in support of its conclusion that Illinois law does not require a return of consideration does not stand for that proposition. Indeed, the case cited by the *TIG* court held that

> inherent in the remedy of rescission is the return of the parties to their proper precontract positions.... *[A] party seeking rescission must restore the other party to the status quo* existing at the time the contract was made. *This rule applies even where the party against whom rescission is sought has committed fraud.*

*Puskar v. Hughes*, 179 Ill.App.3d 522, 127 Ill.Dec. 880, 533 N.E.2d 962, 966 (1989) (emphases added). Thus, the statement in *TIG* relied upon by the Insurers is an inaccurate portrayal of Illinois law.

The other case relied upon by the Insurers is an unpublished decision from a federal district court. *Comm'l Life Ins. Co. v. Lone Star Life Ins. Co.*, No. 88 C 5004, 1989 WL 64715 (N.D.Ill. June 6, 1989); *see* Ind. Appellate Rule 65(D) (providing that "a not-for-publication memorandum decision shall not be regarded as precedent and shall not be cited to any court except by the parties to the case to establish res judicata, collateral estoppel, or law of the case"). Furthermore, we find that the *Lone Star* court also misread Illinois law by relying on the following misleading passage from a Seventh Circuit opinion: "In Illinois it is settled that an insurer is not obligated to return or offer to return any premium 'as a condition precedent to availing itself of its defense to the action on the policy.'" *Dunton v. Conn. Fire Ins. Co.*, 371 F.2d 329 (7th Cir.1967) (quoting *Seaback v. Metr. Life Ins. Co.*, 274 Ill. 516, 113

N.E. 862 (1916)). *Dunton* did not deal with a rescission claim or a fraud defense. Instead, the court merely held that an insurer seeking to avoid coverage on the basis of the contract's express terms—not on the basis of the contract's alleged invalidity—need not return the premium. *Id.* at 331. Thus, the Lone Star court mistakenly took the quote from *Dunton* out of context. Moreover, in *Seaback*, there was "no evidence that [the insurer] ever refused to return to anyone the premiums paid ... and no proof that the premiums were not repaid by it." 274 Ill. at 520, 113 N.E. 862. Furthermore, inasmuch as there was no one legally entitled to be repaid the premiums that had been paid by the policyholder, it was *impossible* for the insurer to return the premium. *Seaback*, therefore, does not lend support to the Insurers' arguments.

Ultimately, we do not find the cases relied upon by Allianz to be persuasive. Thus, we conclude that there is no conflict between Indiana and Illinois law—neither state provides the option of partial rescission to a party asserting fraud. Thus, the trial court should have granted the Policyholders' motion for judgment on the pleadings on Allianz's fraud defense, which we will no longer consider to be a part of this litigation or appeal.[6]

## II. The Duty to Defend

The Insurers argue that the trial court erroneously entered summary judgment in favor of the Policyholders on their claim that Allianz breached its duty to defend the Policyholders from claims stemming from the Ancure Device that occurred—or are deemed to have occurred—during Year One of the Policy. Summary judgment is appropriate only if the pleadings

---

**6.** Inasmuch as we have found that the Insurers are not entitled to raise a fraud defense, we need not and will not consider their challenge to the trial court's order striking the Killacky Affidavit, which was designated in support of their fraud defense.

and evidence considered by the trial court show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Owens Corning Fiberglass Corp. v. Cobb,* 754 N.E.2d 905, 909 (Ind.2001); *see also* Ind. Trial Rule 56(C). On a motion for summary judgment, all doubts as to the existence of material issues of fact must be resolved against the moving party. *Owens Corning,* 754 N.E.2d at 909. Additionally, all facts and reasonable inferences from those facts are construed in favor of the nonmoving party. *Id.* If there is any doubt as to what conclusion a jury could reach, then summary judgment is improper. *Id.*

■ An appellate court faces the same issues that were before the trial court and follows the same process. *Id.* at 908. The party appealing from a summary judgment decision has the burden of persuading the court that the grant or denial of summary judgment was erroneous. *Id.* When a trial court grants summary judgment, we carefully scrutinize that determination to ensure that a party was not improperly prevented from having his or her day in court. *Id.*

### A. Does Merely Filing a Declaratory Action Suspend the Duty to Defend?

■ The Insurers first argue that the mere act of filing an action seeking a declaratory judgment of no coverage automatically suspends the duty to defend. Thus, they contend that their duty to defend was suspended when Allianz filed the Illinois Action.[7] We cannot agree.

Inasmuch as there is no Indiana caselaw supporting this proposition, the Insurers

direct our attention to a line of Illinois cases standing for the proposition that

> when a complaint against the insured alleges facts potentially within the scope of the policy coverage, an insurer taking the position that the complaint is not covered by its policy must defend the suit under a reservation of rights *or* seek a declaratory judgment. An insurer will not be estopped from denying coverage merely because the underlying case proceeds to judgment before the declaratory judgment action is resolved.

*State Farm Fire & Cas. Co. v. Martin,* 186 Ill.2d 367, 238 Ill.Dec. 126, 710 N.E.2d 1228, 1232 (1999) (emphasis in original); *see also Those Certain Underwriters at Lloyd's v. Prof'l Underwriters Agency, Inc.,* 364 Ill.App.3d 975, 302 Ill.Dec. 298, 848 N.E.2d 597, 600–01 (2006) (holding, based on *Martin,* that "an insurer's duty to defend is suspended upon its filing for a declaratory judgment that there is no coverage"). As one commentator has noted, however, the court in *Those Certain Underwriters* appears to have misinterpreted the *Martin* opinion:

> Incorrectly relying on *Martin,* the appellate court held in [*Those Certain Underwriters*] that the insurer had honored its duty to defend by filing a declaratory judgment action and need not also pay defense costs. Somehow this panel of the appellate court missed the fact that *Martin* did not involve defense costs and made no ruling whatever about the duty to pay defense costs while a coverage action is pending. The appellate court stated:
>
>> Defendants attempt to distinguish the rule in *Martin* by noting that there the supreme court addressed only the issue of whether the insurer was es-

---

7. Although the Insurers frequently offer Illinois caselaw in support of this argument, they do not dispute the trial court's conclusion that

Indiana law applies because there is no material conflict between Indiana and Illinois law on this issue.

topped from later denying coverage to the insured because it had filed a declaration that it owed no coverage instead of defending the insured under a reservation of rights. Defendants correctly recite part of the holding in *Martin*, but they overlook its holding that an insurer may opt to file a declaratory judgment action instead of defending the insured and thus suspend the duty to defend pending the resolution of the declaratory judgment action.

[*Those Certain Underwriters*, 848 N.E.2d at 604.]

Martin made no such ruling—not even in dicta. As noted above, *Martin* (a default judgment case) did not involve defense costs. *Martin* stands for the proposition that an insurer can avoid estoppel as to paying any judgment or settlement by filing a prompt declaratory action and not paying defense costs. The appellate court's statement in [*Those Certain Underwriters*] that *Martin* held the filing of a declaratory judgment action "suspends the duty to defend" is simply incorrect. *Martin* never said any such thing. And, of course, this conclusion is flatly contrary to the express holding of [*Gen. Agents Ins. Co. of Am., Inc. v. Midwest Sporting Goods Co.*, 215 Ill.2d 146, 293 Ill. Dec. 594, 828 N.E.2d 1092, 1104 (2005)], which did deal with the issue of whether an insurer is obligated to pay defense costs pending resolution of a timely filed declaratory judgment action....

... Having departed so dramatically from the Illinois Supreme Court's ruling in *Midwest Sporting Goods*, the Second District's opinion in *Professional Underwriters* should not be followed in future cases.

John Vishneski, "The Illinois Supreme Court Gives Policyholders a Break from the Two–Front War," 27 N. Ill. U.L.Rev. 35, 59–60 (2006) (footnotes omitted). We agree, based on this analysis, with the trial court's conclusions herein that *Those Certain Underwriters* is an "anomaly" and that "the decision, which would essentially write the separate duty to defend out of liability insurance policies, does not appear to accurately follow Illinois Supreme Court precedent." Allianz App. p. 52 n. 7.

In any event, inasmuch as the Insurers concede that Indiana law applies, we turn to the generally applicable rules in this state:

> "The law in this jurisdiction is well settled that where an insurer's independent investigation of the facts underlying a complaint against its insured reveals a claim patently outside of the risks covered by the policy, the insurer may properly refuse to defend. However, an insurer refusing to defend must protect its interest by either filing a declaratory judgment action for a judicial determination of its obligations under the policy or hire independent counsel and defend its insured under a reservation of rights. As we have indicated, an insurer can refuse to defend or clarify its obligation by means of a declaratory judgment action. If it refuses to defend it does so at its peril."

*Newnam Mfg., Inc. v. Transcon. Ins. Co.*, 871 N.E.2d 396, 401 (Ind.Ct.App.2007) (quoting *Walton v. First Am. Title Ins. Co.*, 844 N.E.2d 143, 146 (Ind.Ct.App. 2006), *trans. denied*), *trans. denied*.

It is certainly true that the act of filing a declaratory action protects the insurer's right to raise coverage defenses. And in the event that the insurer secures a declaratory judgment that, as a matter of law, coverage does not exist, it is free to disassociate itself from the case and seek reimbursement for its expenses incurred up to that point in time. But to say that

the mere act of filing a declaratory action "suspends" the duty to defend would, as the trial court noted, essentially write the duty to defend out of liability insurance policies. If such a rule existed, insurers would, as a matter of course, file a declaratory action *in every case.* We find that to be poor public policy and simply cannot conclude that such a rule exists in Indiana. Thus, the trial court properly concluded that the mere fact that the Insurers had filed a declaratory action did not suffice to suspend their duty to defend the Policyholders.[8]

### B.   The Batch Clause

■■■ The Insurers next argue that, as a matter of law, the duty to defend has not been triggered because the Policyholders have not established that the SIR was exhausted for Year One. They contend that the trial court erroneously concluded that the Policyholders were only required to establish the potential, rather than the actual, exhaustion of the SIR for the duty to defend to be triggered.

In the Summary Judgment Order, the trial court held that the

> duty to defend is present where the allegations against the policyholder establish merely the possibility of its sustaining a covered liability. Once the duty arises, it continues unless and until the insurer is able to show that the potential no longer exists—either because the policyholder is exonerated of liability to the underlying claimant, or because the insurer can prove as a matter of law that any liability that might be sustained by the policyholder would not

> be within the indemnity coverage afforded by the policy.

Allianz App. p. 54 (citation omitted). To the extent that there is an SIR built into the insurance policy, this is an incorrect statement of the law. Our Supreme Court recently explained that it is only *after* the SIR is exhausted that an insurer's duty to defend, among other things, is triggered. *Cinergy Corp. v. Assoc. Elec. & Gas Ins. Servs., Ltd.,* 865 N.E.2d 571, 576–77 (Ind. 2007); *see also Monroe Guar. Ins. Co. v. Langreck,* 816 N.E.2d 485, 495–96 (Ind.Ct. App.2004) (holding that coverage is available to the insured once the SIR has been satisfied and that the insurer has no claims handling responsibility with respect to claims not exceeding the SIR). It is apparent, therefore, that it is the responsibility of the policyholder to prove this condition precedent to coverage—SIR exhaustion—and unless and until it is able to do so, the duty to defend is not triggered. The trial court, therefore, erroneously concluded that the mere potential for coverage is enough.

■■■ Although the trial court's analysis was erroneous, we may affirm summary judgment if it is sustainable on any theory or basis found in the record. *Havert v. Caldwell,* 452 N.E.2d 154, 157 (Ind.1983). The only way in which summary judgment can properly be granted in the Policyholders' favor on their claim for breach of the duty to defend is if we find that they did, in fact, establish that the Batch Clause was triggered as a matter of law and there are no questions of fact regarding the exhaustion of the SIR.

■■■ The Policyholders concede that there were only two Ancure-related claims

---

8.  On June 12, 2006, the Insurers, in fact, received a declaratory judgment in the Illinois Action that there was no coverage for Year One of the Policy. This judgment did not become final, however, until July 11, 2007—

several months after the trial court entered the appealed orders in the Indiana Action. Moreover, the Insurers never argued to the trial court that the interlocutory Illinois ruling should have been given preclusive effect.

actually made during Year One and that those claims, alone, are insufficient to exhaust the SIR. Instead, the Policyholders turn to the Batch Clause, arguing that it enables them to aggregate claims made after Year One that stem from the same "batch" of Ancure Devices in a way that essentially treats all of those claims as though they were actually made during Year One.

The Policyholders contend that, notwithstanding the trial court's conclusion that establishing the mere potential for coverage is sufficient to trigger the duty to defend, the trial court also found that, in fact, the SIR was exhausted via the Batch Clause. In support of this position, they direct our attention to the Summary Judgment Order in which the trial court repeatedly assumes "the exhaustion of the SIR" and states that the Policyholders are entitled to their reasonable defense costs "in excess of the SIR . . . ." Allianz App. p. 55–56, 61.

Additionally, the Policyholders point to the Batch Clause Order, which, for unknown reasons, the Insurers decided not to appeal. But inasmuch as the Policyholders point out that the trial court explicitly incorporated the Batch Clause Order into its Summary Judgment Order and rely on the trial court's findings therein to support their position that the SIR was satisfied, we will consider the substance of the Batch Clause Order. Appellees' Br. p. 28. In that order, the trial court found that the Batch Clause applied as a matter of law and that, via that clause, the Policyholders have shown "through uncontroverted evidence that the $5 million per-occurrence SIR applicable in Year 1 has been exhausted. . . ." Policyholders' App. p. 2536.

The Batch Clause provides as follows:

The term "batch" means all products which have the same known or suspect-ed defect or deficiency which is identified by the same advisory memorandum. *The term "advisory memorandum" is any communication issued by you to inform health professionals or other appropriate persons or firms of a risk of "bodily injury" or "property damage" from a product in use[.]*

Coverage does not apply to any loss, claim or "suit" which arises out of a defect or deficiency which was known or suspected prior to the retroactive date shown in this policy[.]

When this endorsement is attached to your policy, all losses arising from a single "batch" of your product will be considered to be one "occurrence[.]" Therefore, when multiple losses are considered to be one "occurrence" you must only meet a single [SIR] amount[.] Likewise, our limit of liability due to "bodily injury" and "property damage" is limited to that of a single "occurrence[.]"

All claims made by persons or organization[s] seeking [damages] because of "bodily injury" or "property damage" arising out of one batch will be deemed to have been made at [the time] *the first of those claims is made against you[.]*

Allianz App. p. 264 (emphasis added). Our first task is to consider whether, as a matter of law, the letters relied upon by the Policyholders to trigger the Batch Clause qualify as "advisory memorandum" as defined by the clause.

The Policyholders sent the first so-called "Dear Doctor letter" on March 21, 2001, announcing Guidant's decision to halt the marketing of the Ancure Device and recall products in the field. The letter explained that

[t]his action is being taken as a result of . . . certain deficiencies in [Guidant's] regulatory process and communications with the FDA. *These deficiencies pri-*

*marily relate to failures in communicating problems with the deployment of the endograft, not the graft itself.* While [EVT] believes that the graft can be safely and effectively deployed with appropriate techniques, the company did not correctly communicate either to FDA or the physician community how to address deployment problems with the device.

Policyholders' App. p. 479 (emphasis added). The next Dear Doctor letter was sent on March 31, 2001, providing the following update to the physician community:

We have been working very closely with the [FDA] to review deficiencies primarily related to failures in communicating problems with the deployment of the graft. While we believe the graft can be safely and effectively deployed using appropriate techniques, the company did not correctly communicate either to FDA or the physician community on how to address deployment problems with the device. *Guidant does not believe these issues affect the graft itself.*

*Id.* at 488 (emphasis added).

The final letter was sent on May 2, 2001, again explaining that the reason the device had been recalled was the "various deficiencies in our regulatory and quality systems...." *Id.* at 490. This letter also included the following information:

In a review of recent tests of the [Ancure device] packaging, we discovered conflicting results in shelf life packaging tests. The packaging "passed" some of the tests but did not pass others.... We analyzed our database and found no reported cases where an [Ancure device] caused a patient infection.... [W]e calculated the incremental risk of patient infection related to these packaging issues to be less than one in a million. *Based on these findings, we do not believe there is a safety issue relating to this packaging matter.*

\* \* \*

We want to make it clear that these [regulatory and quality] issues do not affect the long-term safety or performance of the graft....

*Id.* (emphasis added).

As noted above, an advisory memorandum triggering the operation of the Batch Clause is "any communication issued by you to inform health professionals or other appropriate persons or firms of a risk of 'bodily injury' or 'property damage' from a product in use[.]" Allianz App. p. 264. After reviewing the three Dear Doctor letters, we simply cannot conclude that they qualify as advisory memoranda. Rather than informing health professionals of a risk of bodily injury stemming from the Ancure Device, all of the letters sought to do the opposite; namely, they sought to assure the physician community that, notwithstanding regulatory and communication deficiencies, the product itself was safe and effective. Even the third letter, which identifies a potential hazard resulting from packaging problems, explicitly states that after investigating the matter, the company concluded that there was no safety issue as a result of the packaging. Thus, we find as a matter of law that the Batch Clause was not triggered because the Dear Doctor Letters do not qualify as advisory memorandum.[9]

The logical extrapolation from that conclusion is that the Insurers' duty to defend the Year One claims was not triggered

**9.** We also note that the Batch Clause states that "[t]he term 'batch' means *all products which have the same known or suspected defect or deficiency,*" Allianz App. p. 264 (emphasis added), which plainly means what it says— that for a group of products to qualify as a batch, they must share the same defect or deficiency. The trial court herein erroneously concluded otherwise. There is no evidence in the record establishing that the claims sought

because the SIR has not been exhausted. This conclusion, however, leaves us in an awkward procedural posture, inasmuch as the Insurers have elected not to appeal the trial court's order denying their request for summary judgment on the duty to defend the Year One claims. The only order squarely before us on this issue is the Summary Judgment Order that was entered in the Policyholders' favor on the duty to defend. We hereby reverse that order but are unable to direct summary judgment in the Insurers' favor on this issue—even though that is the import of our conclusion—because they have not enabled us to do so.

## CONCLUSION

In sum, we find that the Insurers are precluded from raising a fraud defense, inasmuch as they have retained all premiums and seek to affirm a portion of the Policy. Thus, the trial court should have granted the Policyholders' motion for judgment on the pleadings. Furthermore, the trial court properly concluded that the mere act of filing a declaratory action does not suspend an insurer's duty to defend. Finally, because the Dear Doctor letters do not constitute advisory memoranda within the meaning of the Batch Clause, the SIR has not been exhausted for Year One. Thus, the trial court erroneously granted partial summary judgment in the Policyholders' favor on the duty to defend.

The judgment of the trial court is reversed and remanded for further proceedings consistent with this opinion.

RILEY, J., and MAY, J., concur.

to be aggregated by the Policyholders are based on products that share the same defect or deficiency.